This cause is remanded to the St. Louis County Circuit Court, State of Missouri.

IT IS FURTHER ORDERED that all other outstanding motions are DENIED as moot.

The NODAWAY VALLEY BANK, Plaintiff,

v.

CONTINENTAL CASUALTY COMPANY, Defendant.

No. 86–6098–CV–SJ–6.

United States District Court, W.D. Missouri, St. Joseph Division.

June 23, 1989.

---

ego of the state. Very few of the cases discussed the specific issue before the Court.

**2.** The defendant relies heavily on the case of *State ex rel. Guste v. Fedders Corp.,* 524 F.Supp. 552 (N.D.La.1981). The holding in that case, however, has been substantially undermined by *Tradigrain v. Mississippi State Port Authority,* 701 F.2d 1131 (5th Cir.1983). *See, State of Loui-* siana ex rel. Guste v. Home Depot, Inc., 589 F.Supp. 1254 (E.D.La.1984). The defendant also relies heavily on the Supreme Court decision *Missouri, Kansas and Texas Railway Co. v. Hickman,* 183 U.S. 53, 22 S.Ct. 18, 46 L.Ed. 78 (1901). That decision, however, addressed the issue of whether an agency was the State's alter ego. *See supra,* note 1.

Paul E. Vardeman, Miriam Glueck, Polsinelli, White & Vardeman, Kansas City, Mo., for plaintiff.

Austin F. Shute, Kansas City, Mo., Michael Tone, Peterson, Ross, Schloerb & Seidel, Chicago, Ill., for defendant.

## REVISED OPINION *

SACHS, District Judge.

Plaintiff Bank (Nodaway Valley) seeks recovery on an officers and directors liability insurance policy for expenses and settlement funds advanced by it in underlying litigation. Bank officials had successfully defeated another bank's takeover attempt by using a "squeeze-out" merger, and were thereafter sued by the disgruntled raider who was also dissatisfied with the appraised value of forfeited stock.

The court has heretofore, in orders entered June 21, 1988, and December 12, 1988, denied various legal defenses advanced by defendant insurer after approval by it of the settlement of the underlying litigation against officers, directors and uninsured entities. The court concluded that defendant cannot now litigate, subsequent to the settlement, the applicability of a dishonesty exclusion in its policy. *See Pepsico, Inc. v. Continental Casualty Co.*, 640 F.Supp. 656 (S.D.N.Y.1986), and subsequent cases cited in Doc. 57. The court also concluded that a loss had occurred as a matter of law, based on expenses of litigation and the $500,000 settlement. Summary judgment was therefore granted in favor of plaintiff as to liability (Doc. 81); summary judgment was denied, however, as to damages, and the remainder of the case was tried to the court on the question of allocation both of the settlement sum and litigation expenses, together with other related damage issues. Such allocation is required, as between insured and uninsured parties in the underlying litigation, according to *Pepsico, supra*, and other authorities.

As will appear in more detailed findings adapted from those supplied by the parties, the Stinson, Mag & Fizzell law firm, as counsel for the insured and uninsured defendants in the underlying case (but not the insurer), treated the settlement as entirely attributable to Count IX of the underlying case, which was directed against the officers and directors and prayed recovery of $5,000,000 as compensatory damages and $1,000,000 as punitive damages against each of nine individual defendants. The great bulk of the $300,000 expenses of the underlying and associated litigation, some $226,816, was also attributed by those counsel to the defense of Count IX. By contrast, expert legal testimony offered at trial on behalf of defendant (the Bates testimony) would attribute 70% to 80% of the exposure to a corporate holding company (Bancshares) on a theory that the principal claim is one against majority shareholders, of which Bancshares was one, for engaging in collective conduct in breach of fiduciary duty; that is, squeezing out the plaintiff in the underlying case, United Missouri Bancshares, Inc. (owned and controlled from Kansas City), and forcing it to take the appraised value of its stock. The appraised value turned out to be some $835,000 below what United Missouri had paid for the stock in a speculative venture seeking ultimate control over plaintiff Bank.

Other trial testimony of significance included that of Mr. Beyer, the insurer's manager of professional liability claims, who contended that a 50–50 allocation

---

* This document contains minor changes in the memorandum filed June 13, 1989, and supersedes that opinion. The order of June 13, 1989,

would be "more than fair" to plaintiff.[1] The testimony of the dominant stockholder and officer of United Missouri (Kemper), identified the leaders of the group opposing him as Theodore G. (Ted) Robinson, president of Nodaway Valley, and E.L. Burch, a director of Nodaway Valley and formerly executive vice president of United Missouri, both of whom were stockholders as well as directors and officers named as defendants in Count IX. Defendants' attorneys in the underlying litigation (Mick, Aisenbrey, Foster and Wood) testified in support of the allocation made at the time of settlement of the underlying case.

Based on the testimony heard by me I agree with defendants' attorneys in the underlying litigation that United Missouri was probably acting in a predatory manner as a corporate raider, that a defensive squeeze-out was probably justified in law and fact, and that United Missouri had no more than a 10% to 30% chance of prevailing. Branch banking was formerly forbidden by Missouri law. I am very doubtful that public policy in the State has entirely reversed itself, so that defenders of local control must remain immobilized when a takeover is imminent. Either as a matter of law or on submission to a jury the evidence presented satisfies me that defendants in the underlying case were reasonably likely to prevail.[2] The hazards of litigation, and the potential additional expenses and exposure, fully justified the $500,000 settlement. After all, $300,000 had been spent in the early rounds of the controversy.

While it is difficult to allocate exposure in a defense that seemed probably headed for success, I conclude that trial testimony in the underlying trial would have followed the thrust of the Kemper testimony, making Robinson and Burch the primary targets.[3] It should not have been difficult to minimize or eliminate consideration of the role of Bancshares, a holding company rather than an operating entity, which owned about 23% of the stock during the period of exposure. Bancshares would likely have been viewed by the jury as essentially a basket for holding stock or a collection of legal papers used by the leading individual defendants but not a target of animosity or even a deep pocket.[4] If the underlying case had gone to trial, the jury would probably have understood that Bancshares at the time of trial held assets of many innocent shareholders (including aged and infirm persons) whose identity was dramatized by being present as defendants in the lawsuit. The vulnerability of corporate defendants as such is not in my judgment a serious factor here, and would not have been so viewed by objective and fully knowledgeable counsel at the time of settlement.

directing entry of judgment in favor of plaintiff in the amount of $830,860.18, is unaffected.

1. This testimony is reasonably understood as asserting that a 50% allocation would be roughly appropriate. If the witness meant something else, he should have persuasively clarified his remark.

2. I doubt that the Missouri court would adopt a "polar view" automatically approving or disapproving any and all resistance to takeover attempts. *Dynamics Corp. of America v. CTS Corp.*, 794 F.2d 250, 253 (7th Cir.1986), *rev'd. on other grounds*, 481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987). If left to a jury, the evidence presented to me seems distinctly to favor the defendants in the underlying litigation. The greatest jury appeal in United Missouri's case might arise from resentment of Missouri's squeeze-out merger statute. Presumably the jurors would accept an instruction that the statutory procedure is lawful treatment.

3. Unlike most clients who might acquiesce in their attorneys' tactics, the Kemper personality seems likely to have kept him in charge. Moreover, his deposition testimony, presumably similar to the trial testimony, would have made a change in tactics difficult. For success in the damage claims against stockholders as such, it would be necessary to establish a widespread conspiracy of substantially all the Bank's stockholders other than United Missouri. United Missouri was within .5% of holding enough stock (one-third) to block a merger.

4. This seems a likely jury attitude particularly because counsel could argue to the jury that another bank, also a stockholder as trustee of the Blanchard stock and allegedly guilty of misconduct (D.Exh. 8), was not even joined as a defendant in the underlying litigation, much less targeted as a potential deep-pocket wrongdoer.

■ The Bates testimony was convincing and sound in the ordinary situation, where allocation might be needed between co-defendants who could be a fully operational corporate employer and an employee. The "widow and orphan" shareholder argument occasionally made by zealous counsel is an unconvincing abstraction. In this I would agree with Mr. Bates. Here the sympathetic shareholders are real and the corporation is an abstraction. Under the particular circumstances of this case, I am thus in general agreement with trial counsel for defendants in the underlying case. Their opinion is, however, probably somewhat affected by advocacy in favor of their original clients rather than the insurer. A realistic and fair appraisal, as of the time of settlement, would in my judgment have allocated about 10% of the exposure to the uninsured defendants (principally Bancshares, according to the Bates analysis) and 90% to the insured defendants in Count IX; thus $50,000 of the settlement sum should be treated as uninsured and not recoverable by plaintiff Nodaway Valley.

With respect to allocation of expenses, I agree with the Bates testimony that a practical and fair method of allocation would be according to exposure, which would allow recovery by plaintiff of some 90% of the expenses of the underlying litigation. The allocation by Mr. Wood attempts to be more precise, but needs adjustment. There are arguments for reducing it to exclude counterclaim work and some $25,000 incurred prior to the filing of the damage claim, but such work developed issues usable in defense of the damage claim and was fairly included. There are also arguments for *adding* to the sum to include all work done in defense of the underlying litigation, including work for individual shareholders, before making the 90% allocation. The best approximation of expenses allocable to uninsured parties and work and not recoverable here would be to reduce the expense claim by 10% or $22,682.

I conclude that plaintiff is entitled to prejudgment legal interest on recoverable sums expended; but the novelty and debatable aspect of the issues justified the insurer in litigating. Penalties and fees for vexatious refusal to pay will not be awarded.

Additional particularized findings of fact and conclusions of law are as follows:

## FINDINGS OF FACT

1. Plaintiff Bank is a citizen of the State of Missouri. It is a banking corporation organized and existing under the laws of the State of Missouri with its principal place of business in Maryville, Missouri. It is the surviving Bank of the merger on March 31, 1984, of the Interim Bank of Nodaway Valley (the "Interim Bank") and the original Nodaway Valley Bank (the "Old Bank").

2. Defendant Continental Casualty Company (Continental) is a citizen of the State of Illinois. It is a corporation organized and existing under the laws of the State of Illinois with its principal place of business in Chicago, Illinois. Continental is admitted as an insurance company in the State of Missouri.

3. On March 11, 1982, MGIC Indemnity Corporation ("MGIC") issued a Directors and Officers Liability Insurance Policy Including Bank Reimbursement No. 02531 DA01 (the "Policy") to Old Bank for the Policy period March 11, 1982, to March 11, 1985. The Policy was in full force and effect during the times of this controversy and covers plaintiff's losses up to an aggregate limit of liability for each policy year of three million dollars.

4. Effective November 1, 1983, defendant Continental assumed the duties and obligations of MGIC under the Policy.

5. Effective November 4, 1983, the Policy was amended to include Nodaway Valley Bancshares, the Interim Bank and the Bank as insureds under the Policy. On and before that date, while uninsured, Bancshares held 23% of Old Bank's stock, as set forth in ¶ 10 below.

6. Old Bank was founded by the great grandfather of its current President, Theodore (Ted) Robinson, and is one of four banks located in Maryville, Missouri.

7. For 115 years, from its inception in 1868 until 1983, Old Bank was owned and operated by the descendants of its founder and by certain employees and their descendants, all of whom were native to or lived in the Maryville community.

8. Old Bank's policy has long been to maintain local ownership and control, unlike its competitor banks, all of which are affiliates of out-of-town holding companies. According to the testimony its loan policies have been somewhat different from those with out-of-town ownership, and the Bank prides itself on service to the local community and as a community resource.

9. In 1980, the shareholders of Old Bank initiated the formation of a single bank holding company, Nodaway Valley Bancshares, Inc. ("Bancshares"). The principal purpose of the holding company was to provide a vehicle for purchasing the stock of shareholders which might suddenly and unexpectedly become available, thus encouraging maintenance of local control. The device for defeating the takeover was thus in existence prior to the attempt (a factor considered as a special justification in some cases).

10. In April 1983, James Robinson, a direct descendant of Old Bank's founder, offered to sell his 5,480 shares comprising approximately 23% of Old Bank's 24,000 shares, to Ewart Burch, former executive vice president and a director of Old Bank, for two million dollars.

11. Ewart Burch executed an option to purchase the stock and immediately assigned that option to representatives of Bancshares. Two million dollars (approximately $365 per share) was, up to that time, the highest price ever paid for Old Bank's stock and reflected a significant premium over book value (118%).

12. In order to obtain maximum tax advantages and to avoid any tax penalties resulting from the establishment of the holding company it was essential that, at a minimum, 80% of Old Bank's shareholders exchange their stock for stock in Bancshares.

13. Two of Old Bank's shareholders, Madelyn Bell Ewing and Rebecca Bell (hereinafter the "Bell Sisters") who together owned approximately 32.8% of Old Bank's stock, were not interested in participating in Bancshares but instead preferred to have the entire Bank sold, or at least to dispose of their stock. Their motivation would necessarily have been to achieve greater liquidity or dissatisfaction with dividend income as an investment, or a combination of these factors. There is no evidence showing that the Bank was an attractive investment for another bank, because of its dividends, apart from the possibility of achieving control.

14. On April 27, 1983, the Bell Sisters' New York attorney, David Lihn, met with Old Bank's Board of Directors regarding the sale of the Bell Sisters' stock.

15. At the April 27 meeting, Lihn first suggested that Old Bank be sold, but this suggestion was rejected by the Board. However, the Board offered to purchase the Bell Sisters' stock for the same price that James Robinson would be paid for his stock ($365 per share).

16. Lihn indicated that this offer was inadequate. Nevertheless, Lihn agreed to give Old Bank an opportunity to match any *bona fide* offer made.

17. The next day Lihn called Old Bank's President, Ted Robinson, and indicated that he had a formal offer to purchase the Bell Sisters' stock. Lihn refused to identify the purchaser, but on behalf of the Bell Sisters, he demanded, among other matters, that Old Bank pay $418 per share.

18. On April 29, 1983, United Missouri executed a contract to purchase the Bell Sisters' 7,894 shares at a price of $418 per share or approximately $3,300,000. Pursuant to the terms of the contract, the Bell Sisters were required to use their best efforts to assist United Missouri in acquiring additional shares of Old Bank's stock. The contract further provided that the Bell Sisters would receive an additional $200,000 if United Missouri obtained 50% of Old Bank's stock and another $200,000 if United Missouri obtained 80% of the stock. It is clear that United Missouri was seeking control rather than simply investment in-

come as a minority shareholder. The Kemper testimony to the contrary, or that United Missouri would patiently await an opportunity for control many years later, is unconvincing.

19. On May 1, 1983, in response to what Old Bank's Officers and Board of Directors perceived to be a takeover threat by United Missouri, certain members of the Board consulted with counsel regarding the options available to Old Bank. In addition to seeking to preserve Bank policies, management doubtless felt threatened by the takeover attempt. There is no reason to believe that an anticipated personal profit was expected by acquiring the Bell or United Missouri stock or otherwise preventing a takeover. The objective was entirely defensive.

20. On or about May 6, 1983, all of Old Bank's shareholders, except for the Bell Sisters, entered into a Joint Voting and Stockholders' Agreement ("Stockholders' Agreement").

21. The Stockholders' Agreement provided, in part, that each agreeing shareholder would have the right of first refusal on any sale of Old Bank's stock.

22. On July 20, 1983, the Board of Directors of Old Bank voted, without dissent, to approve the merger of Old Bank into the Interim Bank. Such approval was the legally necessary initial step in a merger proceeding, which in turn was necessary to a squeeze-out. The sole objective of the merger was squeezing out the anticipated United Missouri stock ownership. The directors collectively took this action in their official capacities and became vulnerable to legal challenge. The president of Old Bank was probably the primary leader in taking this action, with E.L. Burch and possibly other directors taking secondary leadership roles.

23. At the stockholders' meeting in August 1983 all stockholders, except the Bell Sisters, voted to approve the merger. Despite receiving notice of the stockholders' meeting, neither of the Bell Sisters attended the meeting and their shares were not voted by anyone.

24. Each shareholder voted his own shares at the August stockholders' meeting, and the Stockholders' Agreement was not utilized because the necessary regulatory approval had not yet been obtained.

25. After Old Bank's shareholders had approved the merger, United Missouri filed protests with both the Federal Reserve Board and the FDIC seeking to block regulatory approval of the merger. These efforts were unsuccessful.

26. In February 1984 all stockholders of Old Bank except United Missouri exchanged their shares in Old Bank for a like number of shares in Bancshares. Afterwards there were two shareholders in Old Bank: Bancshares with 16,106 shares and United Missouri with 7,894 shares. The record does not establish exactly when Bancshares made its offer to purchase the stock of all shareholders except the Bell Sisters and United Missouri. A discriminatory exclusion was part of the plan for merger and squeeze-out, at least by July 1983. The plan was formulated by the key participants, Ted Robinson and several other officers and directors of Old Bank, all of whom were shareholders. It is improbable that these defendants would have formulated the plan if they had been non-officer, non-director stockholders. The plan for Bancshares to make a discriminatory offer, as proposed and initiated by Old Bank's directors, who had a fiduciary duty to all shareholders of Old Bank, including the Bell Sisters and United Missouri, was legally the most vulnerable aspect of the transaction that led to litigation. Apart from its initiation by officers and directors of Old Bank, the offer of Bancshares to some but not all of the Old Bank shareholders would seem privileged as a matter of law.

27. Pursuant to the Merger Agreement, each shareholder of Old Bank had the option of accepting $365 per share for its stock or exchanging each share of Old Bank stock for 5 shares of non-voting cumulative preferred stock in the Interim Bank.

28. Bancshares waived its right to any compensation for its shares of Old Bank stock.

29. In March 1984 United Missouri filed suit in the Circuit Court of Jackson County, Missouri (Case No. CV84–5495), against Old Bank and its directors and officers (the "Director Defendants") as well as Interim Bank and Bancshares seeking to enjoin the merger of Old Bank into the Interim Bank (the "United Missouri Litigation"). The injunction was denied in part because United Missouri failed to show that the merger was illegal (Judge Mauer's Order of March 27, 1984).

30. After United Missouri's efforts to enjoin the merger failed, United Missouri elected to pursue its dissenter's rights in Circuit Court of Nodaway County. *In Re: Petition of United Missouri Bancshares, Inc.*, filed in the Circuit Court of Nodaway County, Missouri, Case No. CV784–81CC. After extensive proceedings involving lengthy written submissions and expert testimony, the panel of appraisers unanimously concluded that United Missouri's stock in Old Bank was worth $312.26 per share as of the date of the merger.

31. Judge J. Morgan Donelson denied United Missouri's request to set aside the appraisers' decision and entered judgment pursuant to that decision. United Missouri unsuccessfully petitioned both the Court of Appeals and the Missouri Supreme Court for extraordinary relief from Judge Donelson's decision.

32. United Missouri subsequently initiated general execution on the judgment and Bancshares paid the judicially determined value of the stock, $2,464,980.44 plus interest, which was about 75% of its purchase price from the Bell Sisters.

33. On or about November 29, 1984, United Missouri amended its petition in the United Missouri Litigation to include, for the first time, shareholder defendants who were not directors and officers and to seek monetary damages.

34. In accordance with the terms of the Policy, on December 3, 1984, notice of a claim against the Director Defendants was timely given to Continental.

35. On December 31, 1984, Continental, through its counsel, acknowledged receipt of the notice of claim and, thereafter, consented to Stinson, Mag & Fizzell's representation of the Director Defendants in the United Missouri Litigation.

36. Counsel for the defendants in the United Missouri Litigation provided Continental's counsel with copies of all depositions and significant pleadings in the case. Additionally, counsel for the defendants apprised Continental's counsel of the status of all settlement discussions.

37. On May 5, 1986, after consultation with Continental's counsel who agreed, on behalf of Continental, that a settlement payment up to $600,000 would not be unreasonable, the Director Defendants in the United Missouri Litigation entered into a settlement agreement with United Missouri (the "Settlement Agreement").

38. Under the terms of the Settlement Agreement, the Director Defendants agreed to pay United Missouri $500,000 in consideration for a dismissal of Count IX of the United Missouri Litigation which was based exclusively on a claimed breach of fiduciary duty by the Director Defendants.

39. The shareholder defendants who were not directors and officers and the corporate defendants entered into a separate settlement agreement with United Missouri in which all parties agreed to mutual dismissals of all other claims and counterclaims. In proposing the form of settlement agreements counsel in the underlying litigation were aware that the disposition was the most advantageous one possible for collecting insurance. Failure to make contemporaneous disclosure of the settlement procedure doubtless caused resentment and suspicion on the part of defendant insurer.

40. In accordance with Missouri law, the shareholders of Bancshares unanimously approved a resolution authorizing the Bank to enter into an indemnity agreement with the Director Defendants for the amounts paid in settlement of the United Missouri Litigation as well as for all attorneys' fees and costs incurred in the defense of the lawsuit.

41. Both the amount of the settlement and the attorneys' fees and costs incurred in defending the Director Defendants have now been paid by the Bank.

42. A total of $300,497 in attorney's fees and disbursements were incurred in connection with the defense of United Missouri's efforts to block the merger, the appraisal proceedings and the defense of the United Missouri Litigation.

43. At the time of the settlement of the United Missouri Litigation, it was the opinion of counsel for the defendants that the claims asserted against the Bank, Interim Bank, Bancshares and the shareholder defendants who were not directors and officers were substantially without merit. This opinion was not entirely objective, however, and was probably influenced by their role as advocates for their clients, not including Continental. As stated above, the court concludes that the most reasonable allocation of settlement responsibility would be 90% to the defendant officers and directors and 10% to the uninsured corporate defendants. Plaintiff Bank should therefore recover from defendant $450,000 out of the $500,000 settlement paid by it.

44. Counsel for the defendants in the United Missouri litigation allocated a total of $226,816 as fees and defense costs incurred in the defense of the Officers and Director Defendants for claims asserted against them in their capacities as directors and officers. This sum should be reduced by 10% to $204,134.

45. The Bank is entitled to prejudgment interest at a rate of 9% per annum on $654,134, from the time it advanced settlement money and expenses on behalf of Continental. Absent more precise proof of such dates, interest will be for three years prior to judgment; that is, $176,626.18. The total recovery will be $830,860.18.

46. Continental's refusal to indemnify the Bank was not willful and vexatious because liability was reasonably contested on several grounds not adequately settled by Missouri law or the law generally and the allocation of damages was subject to wide variances in appraisal by competent counsel. Although several instances of un-reasonable conduct and statements are in evidence, viewed as a whole there was no vexatious refusal to pay.

## LEGAL CONCLUSIONS

There are a number of novel issues in this case, particularly if one were confined to Missouri law for an answer. It must be remembered, however, that the court is not required to resolve all fact and legal issues in the underlying case, but simply to determine what reasonable allocations should have been made, considering uncertainties in both fact and law known at the time of the settlement. In viewing the issue of insurer responsibility, the approach of the Missouri courts would probably replicate that of the Maryland Court of Appeals, which stated,

[h]aving purchased this form of ... insurance, the [insured] is entitled to the full benefit of its bargain. So long as an item of service or expense is reasonably related to the defense of a covered claim, it may be apportioned wholly to the covered claim.

*Continental Casualty Company v. Board of Education of Charles County,* 302 Md. 516, 489 A.2d 536, 545 (1985). *See also Harristown Development Corp. v. International Insurance Co.,* 1988 WL 123149, 1988 U.S.Dist. LEXIS 12791 (M.D.Pa.1988) (following the *Charles County* case and concluding that "costs and expenses for items that were of use in defense of [a covered claim] are recoverable from [the insurer] even though they may also have been useful in defense of [an uncovered claim]"). Even more compelling should be the insurer's complete responsibility (as in Count IX) where insured conduct vicariously implicates an uninsured party (such as a corporate employer) or is the insured official conduct of a person whose acts in another capacity (as stockholder) would not be covered. *Compare State Farm Mut. Auto. Ins. Co. v. Gengelbach,* 664 F.Supp. 1275 (W.D.Mo.1987), *affm'd* 855 F.2d 859 (8th Cir.1988) (without published opinion). In that litigation, where there were both insured and uninsured contributing causes of injury in the case there under considera-

tion and a cited case, it was my view that "[s]ince a major proximate cause of both injuries was within the exception to the exception ... coverage exists." 664 F.Supp. at 1277 n. 1.

The insurer's respondeat superior argument, to the effect that it was liable for the conduct of insured directors and officers but not for the corporate liability created by their acts and should therefore obtain an allocation, comes dangerously close to saying that D & O insurance is *never* adequate insurance, making whole the insureds, when the uninsured corporate employer is joined in litigation with insured officers and directors. This would defeat the reasonable expectations of insureds who have purchased insurance that supposedly gives full coverage for director and officer liability. It seems clear that merely derivative corporate liability should not cause an apportionment between the primary wrongdoer and a vicarious wrongdoer, where both are joined in litigation. My conclusion would not expand the insurance policy to unfairly create corporate coverage; it simply gives full effect to the D & O coverage. Defendant would of course not be exposed to responsibility for corporate coverage where an uninsured employee creates corporate liability or even, apparently, where the corporation alone is sued. I need not deal with the possibility of indemnification from the responsible directors and officers under the D & O policy when only the corporation is sued for their conduct.

The defendant's argument that directors are also stockholders is immaterial, where it is official conduct that is complained of,

as in formulating and adopting a merger plan to be approved by stockholders.[5]

Defendant insurer is of course correct that its policy does not cover stockholder conduct as such, and I agree with Mr. Bates that there is some potential here for claiming majority stockholder misconduct. My understanding of the evidence and of the pertinent law, as well as likely jury appeal of the various claims, causes me, however, to greatly discount the Bates calculation.

It does seem clear that a doctrine of majority stockholder misconduct is widely accepted. *E.g., see, Whale Art Co., Inc. v. Docter*, 743 S.W.2d 511 (Mo.App.1987); *Fisher v. Steelville Community Banc–Shares, Inc.*, 713 S.W.2d 850 (Mo.App. 1986); *Bayne v. Jenkins*, 593 S.W.2d 519, 532 (Mo.1980). The scope of the duty of controlling stockholders has not, however, been "fully defined by application to categorized factual patterns." *Fisher, supra*, 713 S.W.2d at 853.

In the present context, I am inclined to believe that a simple majority of stockholders could lawfully act in their selfish individual interests, in a merger situation (where a majority has no control because of Missouri's two-third approval requirement) and that only a two-thirds majority would be considered a control group precluded from taking oppressive collective action. The concept of controlling interest is all-important (*Fix v. Fix Material Co., Inc.*, 538 S.W.2d 351, 358 (Mo.App.1976)); this is usually the same as a majority interest, but not in the merger context. It is very doubtful here that the dozens of holders of the necessary stock for a merger would be viewed as part of a collective undertaking.[6]

**5.** To the extent defendant may be asking me to make an allocation even under Count IX, where director liability is asserted, because the directors were also stockholders, and uninsured in the latter capacity, the unreasonableness of this contention seems admitted by the insurer's request during the underlying litigation that expenses be allocated between non-director, non-officer shareholder defendants and the shareholders who were also officers and directors. *See* defendant's proposed Finding 31 in the May 31 revision. This implies an expectation that the expenses of the "outside" shareholders would not be paid by the insurer, but those of

the directors and officers would be paid. Counsel for the insurer did not ask that there be a further attempt to split up expenses attributable to shareholder exposure of directors and officers. The dual capacity theory of allocation is also contrary to the Bates opinion, which attempts to exclude from coverage only the corporate exposure of Bancshares.

**6.** It is also unclear, to say the least, that a squeeze-out merger could be considered oppressive, given the available appraisal rights, or that a defensive squeeze-out is not justified as a matter of law. *Fisher* is not contrary to these

Most doubtless reacted individually to a solicitation, as the minority stockholders were entitled to do. It seems quite unlikely, therefore, that United Missouri could have reached the jury on a theory of controlling stockholder misconduct or that the theory would have much jury appeal, even against Bancshares, given the sympathetic nature of many of the alleged co-conspirators, Mr. Kemper's characterization of many of them as innocents, and the likely jury perception of Bancshares' role as simply an instrumentality of Ted Robinson and several other officers and directors of the Bank. Allocating 10% of the responsibility for the settlement to non-insured parties seems almost generous under the circumstances.

Apportionment of responsibilities and expenses between insured and uninsured entities and insured and uninsured claims is commonly mandated, but the methodology has not been refined to an exact science. *See Atlantic Permanent Fed. Savings & Loan Ass'n. v. American Casualty Company*, 839 F.2d 212 (4th Cir.), *cert. denied*, — U.S. —, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988); *Smith v. Mulvaney*, 827 F.2d 558 (9th Cir.1987); *H.S. Equities, Inc. v. Hartford Acc. & Indemnity Co.*, 661 F.2d 264 (2d Cir.1981); *McLean v. Alexander*, 449 F.Supp. 1251, 1271–4 (D.Del.1978), *rev'd. on other grounds*, 599 F.2d 1190 (3rd Cir.1979). As indicated in the findings of fact, I have concluded that the expense allocation by counsel in the underlying litigation was not so objective that it should be accepted without further scrutiny. Treating the burden of proof and persuasion as being on plaintiff, both as to allocation of the settlement sum and of expenses, I have concluded that shaving 10% from the Wood allocation of expenses is the best approximation that can be made under the circumstances. Such an estimate is adequate under Virginia law (*Atlantic Perma-*

*nent, supra*, 839 F.2d at 218), and I believe it will suffice under Missouri law as well.

Missouri cases support an allowance for prejudgment interest, even though the claim against the insurer for moneys previously advanced could not be specified until an allocation occurred. *Catron v. Columbia Mut. Ins. Co.*, 723 S.W.2d 5 (Mo.1987); *Mauer v. State Employees' Retirement System*, 762 S.W.2d 517 (Mo.App.1988). Defendant insurer has long had the benefit of plaintiff's advances, and should pay for the use of the funds.

Finally, I reject plaintiff's claim for attorneys' fees and penalties for vexatious refusal to pay under § 375.420 RSMo. There were significant and substantial open questions of state law and of fact (particularly a wide range of respectable legal appraisals necessary for an apportionment). Regardless of whether in this complex controversy the insurer and its counsel may have engaged in occasional petty posturing on particular points I must conclude that viewing the matter as a whole there is no basis for imposition of fees and penalties. *Vitale v. Aetna Cas. & Surety Co.*, 814 F.2d 1242, 1251 (8th Cir.1987) (distinguishing the inadequacy of a mere "litigable issue" defense in *DeWitt v. American Family Mut. Ins. Co.*, 667 S.W.2d 700, 710 (Mo.1984)). It will be noted that a former Missouri judge and a very experienced former Missouri lawyer joined in the *Vitale* view that *DeWitt* marked no radical change in the cautious approach of Missouri law to such penalties and fees.[7]

---

conclusions, being dependent on pre-merger misconduct and other facts. *See,* however, *Forinash v. Daugherty,* 697 S.W.2d 294, 304 (Mo. App.1985), for a statement that *directors* may not " 'favor one intracorporate group to the detriment of another'." *Compare, Torchmark Corp. v. Bixby,* 708 F.Supp. 1070, 1081 (W.D.Mo. 1988).

7. This is not a case where the insurer's refusal to pay an allocated share of the settlement sum and expenses represents a small disagreement as to the "precise amount" of liability, which *DeWitt* says may not justify a refusal to pay. 667 S.W.2d at 710 n. 9. Nor is it like the case cited in *DeWitt, Fohn v. Title Ins. Corp. of St. Louis,* 529 S.W.2d 1, 5–6 (Mo.1975), where the

loss turned out to be the minimum asserted by the insured (a result favorable to the insurer), and the insurer's responsibility for trial costs was based on a total abandonment of the insured with no legitimate reason. It will be further observed that this court is the fact-finder in this instance, and has a great deal more discretion than in *DeWitt* to reject a claim of vexatious refusal to pay. Denial of such a claim

may occur as a " 'matter of pure discretion'." *DeWitt,* 667 S.W.2d at 711. It may be added, however, that if prejudgment interest should be rejected on appeal I would like an opportunity to reconsider the denial of vexatious refusal damages here requested by plaintiff. My conviction that the judgment to be entered is a fair one is influenced by my assumption that plaintiff Bank is entitled to prejudgment interest.