CATERPILLAR INC., Plaintiff,

v.

GREAT AMERICAN INSURANCE
COMPANY, Defendant.

No. 94–1060.

United States District Court,
C.D. Illinois,
Peoria Division.

Sept. 6, 1994.

As Amended Sept. 15, 1994.

William R. Jentes, Chicago, IL, Theodore R. Johnson, Peoria, IL, for plaintiff.

Michael P. Comiskey, Chicago, IL, for defendant.

## ORDER

MIHM, Chief Judge.

This matter is before the Court on Caterpillar's Motion for Partial Summary Judgment on Count I of its Complaint. For the reasons set forth herein, Caterpillar's Motion is GRANTED IN PART and DENIED IN PART. The Court certifies certain rulings for an immediate appeal under 28 U.S.C. § 1292(b).

## RELEVANT BACKGROUND

This case raises the issues of (1) the proper allocation of a "Loss" between an insured and insurer under a directors and officers liability insurance policy and (2) the proper construction of certain terms in that policy.

On May 11, 1994, the Court approved a settlement valued between $17,250,000 and $23,000,000 in the cases of *Kas v. Caterpillar Inc., et al.*, 815 F.Supp. 1158 (C.D.Ill.1992), and *Margolis v. Caterpillar Inc., et al.*, 815 F.Supp. 1150 (C.D.Ill.1991) ("*Kas* shareholder litigation"). Those actions involved claims against Caterpillar ("CAT") and five of its directors and officers, alleging violations of federal securities laws and common law fraud. This action involves Caterpillar's claims against Great American Insurance, CAT's directors and officers ("D & O") liability insurer for the relevant period, for reimbursement of 100% of the settlement amount in the *Kas* shareholder litigation in excess of the applicable retention.

Section I of the Insurance Policy states that Great American agrees:

> With the Directors or Officers of the Company that if, during the Policy Period or the Discovery Period, any Claim is first made against the Directors or Officers, individually or collectively, for a Wrongful Act the Insurer will pay on behalf of the Directors or Officers all Loss which the Directors or Officers shall be legally obligated to pay, except for such Loss which the Company actually pays as indemnification.

> With the Company that if, during the Policy Period or the Discovery Period, any Claim is first made against the Directors or Officers, individually or collectively, for a Wrongful Act the Insurer will reimburse the Company for all Loss which the Company is required to indemnify, or for which the Company has to the extent permitted by law indemnified the Directors or Officers.

The "Wrongful Acts" covered by the policy include:

> [A]ny actual or alleged error, misstatement, misleading statement, act or omission, or neglect or breach of duty by the Directors or Officers in the discharge of their duties solely in their capacity as Directors or Officers of the Company, individually or collectively.

Section III.D. Section II.E defines "Loss" as "compensatory damages, settlements, and Costs of Defense...." Section V.A provides that Great American would pay 100% of a "Loss" in excess of the applicable retention amount, $10,000,000 in this case, up to $25,-000,000.

The parties do not dispute that CAT must pay the initial $10,000,000 of the *Kas* settlement. CAT's motion for partial summary judgment on Count I seeks a declaratory judgment that Great American must pay the full amount of the settlement and defense costs, after deducting the $10,000,000 retention. Although CAT's pleadings argue that it should be reimbursed for 100% of the settlement amount and defense expenses, at oral argument, Mr. Jentes, CAT's attorney, indicated that CAT was willing to negotiate with Great American regarding defense ex-

penses and was not asking the court to rule on the amount of defense expenses. Mr. Jentes stated:

> [W]e're not asking Your Honor to decide on the amounts of the defense costs.... I might emphasize that that's not something which we necessarily stand pat on what was submitted to the insurance company. That is a negotiable item. I will be very candid with you.

Transcript of May 16, 1994, pp. 49–50. Therefore, this order is limited to the issue of a possible allocation of the settlement amount and not defense costs. The Court will rule on a possible allocation of defense costs later if the parties are unable to reach an agreement on their own.

## DISCUSSION

Summary Judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In considering a motion for summary judgment, the Court views the record and all inferences drawn from it in the light most favorable to the nonmovant. *Griffin v. Thomas*, 929 F.2d 1210, 1212 (7th Cir.1991). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Great American argues that a dispute of material fact exists regarding whether and by what means CAT "has undertaken to indemnify" the defendant directors and officers for 100% of the settlement payment. According to CAT:

> CAT has undertaken to indemnify the Directors and Officers against the full amount of this loss and any costs of defense, as it is specifically authorized to do under the Delaware General Corporation Law.

CAT Memorandum in Support of Partial Motion for Summary Judgment on Count 1, p. 6. Article V of CAT's By–Laws provides for indemnification of its Directors and Officers as follows:

> The corporation shall indemnify to the full extent permitted by, and in the manner permissible under, the laws of the State of Delaware any person made, or threatened to be made, a party to an action or proceeding, whether criminal, civil, administrative or investigative, by reason of the fact that he, his testator of intestate is or was a director or officer of the corporation or any predecessor of the corporation, or served any other enterprise as a director or officer at the request of the corporation or any predecessor of the corporation.

> The foregoing provisions of this Article V shall be deemed to be a contract between the corporation and each director and officer who serves in such capacity at any time while this bylaw is in effect, and any repeal or modification thereof shall not affect any rights or obligations then existing with respect to any state of facts then or theretofore existing or any action, suit or proceeding theretofore or thereafter brought based in whole or in part upon any such state of facts.

Affidavit of Gail M. Blades in Support of Partial Summary Judgment, p. 5–6.

Although CAT's by-laws provide. for indemnification of its directors and officers, Great American contends that CAT has not offered any evidence to support its claim that it "has undertaken to indemnify" its directors and officers. CAT has not yet indemnified the defendant directors and officers because the administration of the *Kas* settlement is still ongoing. For example, all settling plaintiffs' proofs of claim were due by July 26, 1994, with 30 days thereafter to cure any deficiencies of which the claimant is advised. *See Kas* Stipulated Order Amending Order Preliminarily Approving the Settlement, Directing Notice, Providing for Exclusion, and Fixing Hearing Date; Stipulation and Agreement of Settlement; and Order and Final Judgment. Great American contends, and the Court agrees, that it is entitled to discovery regarding whether CAT "has undertaken

to indemnify" its directors and officers, by what means, and for what specific amount.

*I. Allocation of Kas Settlement Amount*

 ▉ Initially, the Court looks to the parties' insurance policy and finds that, unlike the policies at issue in *Safeway Inc. v. National Union Fire Insurance Co.,* 805 F.Supp. 1484 (N.D.Cal.1992), and *First Fidelity Bancorporation and Financial Institutions v. National Union Fire Insurance Company,* No. 90–1866, 1994 WL 111363 (E.D.Pa. March 30, 1994), it does not contain a clause explicitly requiring an allocation between the corporation and the insureds. In *Safeway,* the policy provided:

> With respect to the settlement of any claim made against the Company and the Insured, the Company and the Insureds and the Insurer agree to use their best efforts to determine a fair and proper allocation of the settlement amount as between the Company and Insureds.

*Safeway,* 805 F.Supp. at 1490. Similarly, the policy at issue in *First Fidelity* provided that in the event of a settlement of a claim where First Fidelity and the directors and officers were both named, the insurance company and First Fidelity were required to "use their best efforts to determine a fair and proper allocation of the settlement amount as between the Company and the Insureds." *First Fidelity,* 1994 WL 111363, *2. Howeverer, the lack of such a provision in this case does not dispose of the allocation issue because the policy clearly provides that only claims made against the directors and officers, not the corporation or other employees, are covered. The policy provides for reimbursement to CAT only for the amount it indemnifies the defendant directors and officers. Moreover, other decisions, including one from the Seventh Circuit, have allowed an insurer to allocate settlement amounts between covered and uncovered claims in the underlying dispute despite the absence of an express allocation provision in the insurance policy. *See Harbor Insurance Co. v. Continental Bank Corp.,* 922 F.2d 357 (7th Cir. 1990); *Nodaway Valley Bank v. Continental Cas. Co.,* 715 F.Supp. 1458 (W.D.Mo.1989), *aff'd,* 916 F.2d 1362 (8th Cir.1990).

Both parties rely on the Seventh Circuit's decision in *Harbor Insurance Co.* for guidance on the proper allocation of the *Kas* settlement amount between CAT and the insured defendants. In *Harbor,* two securities actions had been filed. One action named Continental and five of its directors as defendants. The other named Continental and 25 directors, officers and employees identified only as "John Does." *Id.* at 359. Continental settled the two cases and sought reimbursement of $15 million from Harbor and the remaining $2.5 million from Allstate. *Id.* The insurers prevailed at trial on a defense to the policy that is not at issue in this case. The Seventh Circuit reversed on that issue and remanded the case for a new trial. Although the jury did not reach the issue of damages, the court discussed the issue "in the hope of furnishing guidance for the trial and perhaps also of facilitating settlement." *Id.* at 367.

The Seventh Circuit considered the possibility that some portion of the $17.5 million settlement was attributable to individuals or activities that were not insured under the D & O policy. This possibility was "implied" by the suit against the "John Doe" defendants and the claim that:

> [O]ther agents or employees of Continental contributed materially to the fraud and that without their activities the settlement would have been lower because the damage done to the members of the class would have been less.

*Id.* The Court then stated:

> To the extent that the amount for which Continental settled was larger than it would have been but for the misfeasance of these other people—either noninsured persons or persons against whom no claim was made—Continental's entitlement to reimbursement in this suit would be cut down.

*Id.* The court held that 100% of the settlement amount should be allocated to the directors and officers:

> except for the portion, if any, of Continental's derivative liability that was due to the conduct of other directors, officers, or employees, besides those directors and offi-

cers against whom claims were made within the meaning of the policy. *Id.* at 368. Thus, under *Harbor,* the issue is not whether uninsured persons or persons not named in the underlying litigation contributed to potential liability, but whether the settlement amount increased because of their conduct beyond the amount to which the corporation was already exposed by virtue of the defendant insureds' conduct.

Great American is only obligated to pay for claims made against insured directors and officers. Sections I.A. and I.B. Therefore, to the extent that the *Kas* settlement amount would have been lower but for the activities of other employees or directors and officers besides those directors and officers against whom claims where made, CAT is not entitled to reimbursement.

CAT contends that this case is distinguishable from *Harbor* because the *Kas* plaintiffs did not allege that any of their damage was attributable to non-insured individuals or activities. Great American argues that genuine issues of material fact exist regarding whether the *Kas* complaint accused CAT of any wrongful actions of which the defendant directors and officers were not also accused. Paragraph 33 of the *Kas* Second Amended Consolidated Complaint ("*Kas* complaint") contained the following allegations against CAT:

> The false and misleading statements regarding Caterpillar's Brazilian and overseas operations are as follows:
> (a) [A]lthough *Caterpillar disclosed* that its Brazilian operations generated only 5% of Caterpillar's overall sales, this statement was misleading because it concealed the fact that these operations generated an undisclosed 20% of profits.
> (b) In a press release issued on January 18, 1990, after the close of the securities trading markets, *Caterpillar reported* its year-end and fourth quarter 1989 results.... The press release was misleading in that while it referred to "considerable pressure" on profits in 1990, it failed to disclose the significance of the Company's Brazilian operations for its profits....
> (f) In the 1989 Annual Report, *Caterpillar reported* that....

(h) In Caterpillar's Quarterly Report on form 10–Q for the first quarter ended March 31, 1990 ... signed by defendant Rager, released on or about May 9, 1990, *the Company again reported* that.... This representation was misleading because....

In addition, paragraph 43 of the *Kas* complaint alleged that "CAT and the Individual Defendants" misled the Company's shareholders. Paragraph 46 alleged that CAT's entire board of directors acted collectively in connection with the alleged frauds:

The name of each person and/or entity who is responsible for, participated in, conspired to bring about, or aided and abetted the fraud complained of herein, is set forth in this Complaint. The Individual Defendants herein operated as a collective entity through periodic meetings held either in person or telephonically and with Caterpillar's Board of Directors wherein they discussed matters affecting Caterpillar's business and reached collective and consensual discussion as to what action to take. The members of the Board who are named as defendants herein also received similar, if not identical, information in the form of oral reports and information from Caterpillar's executives, written reports from Caterpillar's employees and management relating to the Company's business including internal, periodic (including monthly) financial statements and official data and reports in advance of, at and subsequent to Board meetings in connection therewith. Corporate business of Caterpillar at the Board level was conducted through formal resolutions passed by the directors acting collectively as is reflected in the minutes of Caterpillar's Board of Directors' meetings. The Caterpillar Board acted collectively to issue Caterpillar's annual and quarterly reports to the SEC and its shareholders, which reports were presented to and approved by the Board either before their issuance or shortly thereafter. Thus, because Caterpillar's Board acted as a unit, conducted Caterpillar's business pursuant to consensual agreements and formal resolutions as a Board, and received collectively the same information about Caterpillar's business at or about the same time, it is appropriate to treat the members of the Board, both inside and outside directors, as a unit for pleading purposes.

The *Kas* complaint does not specify whether these actions attributed to CAT were taken by CAT through and only through the named individual defendants or by CAT through other directors, officers, employees, or agents. The *Kas* complaint's references to CAT and its board of directors, as opposed to the named individual defendants, raises the possibility that the settlement amount was larger because of activities of uninsured persons or persons against whom no claim was made, and Great American is entitled to allocate this potential amount to CAT.

■ Although *Harbor* dictates that Great American may allocate to CAT the portion of the settlement amount due to the activities of uninsured persons and persons against whom no claim was made, Great American will not be allowed to go beyond the allegations in the underlying complaint and speculate as to what claims the *Kas* plaintiffs might have brought. In other words, Great American will only be allowed to attempt to prove that all or part of those activities attributed to CAT and its board in the *Kas* complaint were performed by uninsured persons or persons against whom no claims were made.

Allocation is to be based on the claims that were actually settled, not on claims that could have been brought or that the class plaintiffs might have chosen to pursue, but did not. *Raychem Corporation v. Federal Insurance Company,* 853 F.Supp. 1170 (N.D.Cal.1994).

Great American will not be allowed to reopen "the case to consider claims which did not play a part of the settlement." *Id.* *See also Nordstrom, Inc. v. Chubb & Son, Inc.,* 820 F.Supp. 530, 535 (W.D.Wash.1992) (An allocation of a settlement amount should be based only on the claims that were actually settled, "not on claims that could have been brought or that the class plaintiffs might have chosen to pursue, but did not.").

Great American relies on evidence of misconduct by persons other than individual defendants found by the SEC in its Opinion and Order. *See* Great American's Separate

Proposed Findings of Fact and Conclusions of Law in Connection with Caterpillar's Motion for Partial Summary Judgment, pp. 2–5. Specifically, the SEC's Opinion and Order refers to actions by CAT's accounting department personnel, board of directors, legal, economic, and public affairs departments, independent auditor, and General Counsel. CAT consented to the issuance of the Opinion and Order without admitting or denying any of the SEC's findings. *Id.*, p. 2 fn. 1. The *Kas* plaintiffs never sought to amend their complaint following the issuance of the SEC Opinion and Order dated March 31, 1992. *See* Caterpillar's Memorandum in Support of 1292(b) Certification of the Allocation, But Not the Notice, Issue and of its Supplemental Proposed Findings, p. 9. Great American will not be allowed to allocate a portion of the settlement amount to CAT based solely on the SEC's findings. However, to the extent that Great American can prove after discovery that references in the *Kas* complaint to actions by CAT and its board include persons named in the SEC Opinion and Order, an allocation would be allowed if such person's actions increased the *Kas* settlement amount.

■ In *Harbor*, the insurers also argued that Continental's recovery should be reduced because Continental was named in the underlying litigation and Continental was not insured under the D & O policy for its own liability. The Seventh Circuit rejected this argument and found that Continental was only liable because of the activities of its directors and officers, and they would be ultimately liable for the full amount of the settlement. The court stated:

[U]nder the law governing the allocation of responsibility among joint tortfeasors, one whose only liability is derivative, such as an employer's liability for a tort committed by an employee, has always been able to obtain full indemnification from the tortfeasors whose liability is primary (the employee in our example, corresponding to the directors in this case).... So if the suit had gone to judgment and the plaintiffs had sought to collect any part of the judgment from Continental, Continental would have been entitled to turn around and demand reimbursement from the directors. The entire cost of the judgment would have become an expense to them. The charter authorized Continental to waive this right, and the loss sustained by it as result of the waiver—the loss for which Harbor and Allstate insured it— would be the entire amount of the judgement.

*Harbor*, 922 F.2d at 368. The *Harbor* court concluded that Continental was entitled to seek indemnification against the insured directors for any liabilities incurred in connection with the underlying securities litigations. An allocation between the directors' liability and the corporation's derivative liability for the directors would "rob Continental of the insurance protection that it sought and bought." *Id.* The Court held that:

[T]he entire $17.5 million of joint liability should be allocated to the directors and therefore that Continental is entitled to recover up to the insurance limits, except for the portion, if any, of Continental's derivative liability that was due to the conduct of other directors, officers, or employees, besides those directors and officers against whom claims were made within the meaning of the policy.

*Id.*

In so ruling, the *Harbor* court relied on *Nodaway Valley Bank v. Continental Casualty Co.*, 715 F.Supp. 1458 (W.D.Mo.1989), *aff'd* 916 F.2d 1362 (8th Cir.1990). In *Nodaway*, the district court rejected the insurer's argument that it was liable for the conduct of insured directors and officers but not for the corporate liability created by their acts. The court held that derivative corporate liability should not cause an apportionment between the primary wrongdoer and a vicarious wrongdoer where both are joined in the litigation and, therefore, the D & O insurer should provide full coverage. *Id.* at 1466. The court stated that the insurer's argument:

comes dangerously close to saying that D & O insurance is never adequate insurance, making whole the insureds, when the uninsured corporate employer is joined in litigation with insured officers and directors. This would defeat the reasonable expectations of insureds who have pur-

chased insurance that supposedly gives full coverage for director and officer liability. It seems clear that merely derivative corporate liability should not cause an apportionment between the primary wrongdoer and a vicarious wrongdoer, where both are joined in litigation. My conclusion would not expand the insurance policy to unfairly create corporate coverage; its simply gives full effect to the D & O coverage. Defendant would of course not be exposed to responsibility for corporate coverage where an uninsured employee creates corporate liability or even, apparently, where the corporation alone is sued.

*Id.*

The *Harbor* court found that Continental's only liability was vicarious and arose primarily from the conduct of the directors and officers. Great American argues, however, that a corporation may be held primarily liable for securities fraud. Great American notes that Sections 10(b) and 20 of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b–5 prohibit specified actions by "any person," which includes a company. Also, the Supreme Court has found that 10b–5 "impose[s] direct liability on defendants for their own acts as opposed to derivative liability for the acts of others." *Musick, Peeler & Garrett v. Employers Insurance of Wausau,* — U.S. —, —, 113 S.Ct. 2085, 2090, 124 L.Ed.2d 194 (1993). Great American maintains that the "derivative theory" contained in *Harbor* is flawed and not supported by *PepsiCo, Inc. v. Continental Casualty Co.,* 640 F.Supp. 656 (S.D.N.Y.1986), *Perini Corp. v. National Union Fire Insurance Co.,* No. 86–3522S, 1988 WL 192453 (D.Mass. June 2, 1988), and *First Fidelity Bancorporation v. National Union Fire Insurance Co. of Pittsburgh, PA.,* 1994 WL 111363 (E.D.Pa. March 30, 1994).

Great American also relies on *Naye v. Boyd,* Fed.Sec.L.Rep. (CCH ¶ 92, 979, 1986 WL 198 (W.D.Wash.1986)). The *Naye* court held that although a corporation is only able to act through its agents, it can be held directly responsible for securities fraud under some circumstances. *Id.,* at *1. The court relied on the statutory language of Section 10b and Rule 10b–5, which prohibits

specified actions by "any person." The Act's definition of "any person" includes a company. Therefore, the *Naye* court concluded that the language of the Act contemplates the possibility of violations by a corporation. The court then held that the scope of potential direct corporate liability for securities fraud is narrower than corporate liability based on respondeat superior. *Id.* For example, a corporation may be held directly responsible for the acts of senior management personnel, but not for the conduct of lower level employees. The court also held that direct corporate liability may be based on actions that are "intrinsically corporate and bear the imprimatur of the corporation itself, such as purchase and sale of corporate assets or issuance of reports in the name of the corporation." *Id.,* at *2.

In *PepsiCo,* several suits under 10b–5 were filed against PepsiCo, its directors and officers, its accounting firm, Arthur Young, and a former officer. *PepsiCo,* 640 F.Supp. at 658. PepsiCo argued that Continental should reimburse the corporation the full amount of the settlement up to the policy limit because the insured directors and officers remained jointly and severally liable for the entire amount. The insurer maintained that the directors' and officers' risk of liability was minimal relative to the risk facing PepsiCo and its accounting firm. *Id.* at 661. The court held:

> The policy clearly provides that it covers only the Directors and Officers of PepsiCo, not the Corporation and not its accounting firm.
>
> \* \* \* \* \* \*
>
> Continental has not insured the Corporation or Arthur Young, both of which benefitted from the settlement. It is extremely unlikely that the directors and officers would have agreed to a settlement, the costs of which they would be expected to pay in toto.... Allocation of responsibility according to the relative exposures of the respective parties to the class action litigation is therefore appropriate.
>
> \* \* \* \* \* \*

This court concludes, therefore, that the Policy requires the parties to allocate the

settlement costs between those amounts attributable to the directors and officers and those attributable to PepsiCo and its accountants. *Id.* at 661–62. However, evidence of a good faith settlement of the underlying litigation creates a presumption that the costs are covered by the policy. *Id.* at 662.

In *Perini*, the policy at issue only covered actions brought against directors and officers. The Perini Corporation sought to recover all legal fees and expenses incurred in defending the corporation and two of its officers in a lawsuit. The court held that the costs of the law firm hired to defend one of the officer defendants and the corporation must be allocated between the cost of defending the officer and the cost of defending the corporation. *Perini,* 1988 WL 192453, at *1 (D.Mass.1988).

Finally, in *First Fidelity,* numerous class action and derivative suits were filed against First Fidelity and its directors and officers. *First Fidelity Bancorporation,* 1994 WL 111363, at *1. First Fidelity argued "that because its liability was merely derivative, and the liability in the underlying litigation was based exclusively on the conduct of the directors and officer," the insurer was not entitled to allocation. *Id.,* at *11. The Court rejected this argument and found that:

> [B]oth the directors and officers as well as the corporate entity faced liability in the underlying litigation. The mere fact that liability arises exclusively from the conduct of the insured does not provide a basis for the insurer to be responsible for the liability of those who are uninsured. For instance, Section 11 of the Securities Act of 1933 provides separate standards of liability for issuers, such as First Fidelity, and individuals, such as directors and officers. As stated by First Fidelity's expert, an issuer is almost absolutely liable for any misstatements made in connection with the sale of securities, but the directors and officers are allowed a due diligence defense. The occasion could arise where liability results from the conduct of the insured directors and officers, but they are found not liable by way of the due diligence defense, but the issuing corporation

is found liable. In this instance, First Fidelity would contend that the D & O insurer should pay the damages on behalf of the issuing corporation, who is not insured under the policy. Such a result would be contrary to the purpose of the party's intent under the policy.

*Id.,* at *11–12.

Despite these cases, in *Harbor,* Continental and five of its directors were named in one underlying suit and the court declined to allocate a portion of the settlement amount to Continental based on the possibility that Continental could have been held directly liable. Although the *Harbor* court's discussion of the allocation issue is dicta (because it was not necessary to the outcome of the decision), it is the best indication of how the Seventh Circuit would decide the issue. Therefore, Great American is not entitled to an allocation based on CAT's potential direct liability in the *Kas* suit.

In sum, the Court has ruled that CAT is entitled to reimbursement for the *Kas* settlement amount suffered as a result of claims made by the *Kas* plaintiffs against CAT or the Individual Defendants to the extent such Loss is based on the alleged Wrongful Acts of the Individual Defendants and subject to the $10,000,000 retention. CAT is not entitled to reimbursement to the extent that the settlement is larger because of the activities of (a) persons who were not insured under the Policy (persons who were not Directors or Officers of CAT at that time), or (b) persons who were not named as defendants in the *Kas* Complaint. The Court cannot find at this time that there is no genuine dispute of material fact concerning whether the *Kas* settlement is larger because of the acts of persons who were not directors or officers or who were not named as defendants in the *Kas* litigation. Therefore, CAT's motion for partial summary judgment is denied with respect to this issue, without prejudice to the filing of a renewed motion after discovery is completed.

## II. *Notice of Settlement Offers*

As a defense to CAT's attempt to recover on the Policy, Great American argues that CAT breached a policy condition

precedent by making unreasonably high initial settlement offers without Great American's prior knowledge or consent. Illinois law provides the substantive legal rules applicable to this diversity action. *Anetsberger v. Metropolitan Life Ins. Co.*, 14 F.3d 1226, 1231 (7th Cir.1994). Interpretation of insurance contracts is a matter of law and therefore, appropriate for disposition by way of summary judgment. *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill.2d 384, 189 Ill.Dec. 756, 760, 620 N.E.2d 1073, 1077 (1993); *Hartford Ins. Co. v. Jackson*, 206 Ill.App.3d 465, 151 Ill.Dec. 451, 453, 564 N.E.2d 906, 908 (1990). In construing the terms of an insurance policy, the court must ascertain the intent of the parties. *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 704, 607 N.E.2d 1204, 1217 (1992). If the provisions of an insurance policy are clear and unambiguous, the court must enforce them according to their plain meaning. *Uhwat v. Country Mutual Insurance Co.*, 125 Ill.App.3d 295, 80 Ill.Dec. 618, 622, 465 N.E.2d 964, 970 (1984). An insurance policy is ambiguous if it is subject to more than one reasonable interpretation. *Economy Fire & Casualty Co. v. Kubik*, 142 Ill.App.3d 906, 97 Ill.Dec. 68, 70, 492 N.E.2d 504, 506 (1986). When determining whether an ambiguity exists, all the provisions of the insurance contract, rather than an isolated part, should be read together. *United States Fire Ins. Co. v. Schnackenberg*, 88 Ill.2d 1, 57 Ill.Dec. 840, 842, 429 N.E.2d 1203, 1205 (1981). Finally, ambiguous language is strictly construed against the insurer as the drafter. *Insurance Corp. of Ireland, Ltd. v. Board of Trustees of S. Ill. Univ.*, 937 F.2d 331, 336 (7th Cir.1991); *Outboard Marine Corp.*, 180 Ill.Dec. at 704, 607 N.E.2d at 1217.

The Illinois Amendatory Endorsement provides that no action shall lie against Great American "unless, as a condition precedent thereto, there shall have been full compliance by the Insured with all of the terms of this Policy." *See also LaSalle National Bank v. Metropolitan Life Insurance Company*, 18 F.3d 1371, 1374 (7th Cir.1994) (Failure to perform a condition precedent may be construed as a breach of contract). Great American contends that by making and re-publishing settlement offers, CAT failed to comply with Sections VI.A. and VI.C. of the Insurance Policy, and the Loss of the *Kas* settlement should not be covered. CAT responds that neither of those sections nor any other section in the Policy required CAT to notify Great American of settlement offers CAT planned to communicate to the *Kas* plaintiffs.

In October 1991, Mr. R. Rennie Atterbury, CAT's then Associate General Counsel, wrote to Mr. William Bila, Great American's counsel, and stated that:

> The possibility of settlement prior to finalization of the plaintiffs' complaint is being explored. No definitive offer has been made to, or received from, the plaintiffs. Whether or not an acceptable settlement can be reached will depend on a variety of factors, including the cooperation of Caterpillar's insurer. Needless to say we will keep you advised of developments in this area.

Great American believes that in November or December of 1991, CAT's defense counsel, Orrick, Herrington & Sutcliffe, made an oral settlement offer to the *Kas* plaintiffs worth between $20,000,000 to $50,000,000 (the "1991 Offer"). CAT did not seek Great American's consent prior to making the 1991 Offer. The 1991 Offer was twice repeated to the plaintiffs without Great American's knowledge or consent. On May 27, 1992, Michael Torpey of Orrick, Herrington & Sutcliffe, CAT's counsel, wrote to the *Kas* plaintiffs' counsel and offered to discuss the 1991 Offer (the "Torpey Letter"). CAT did not advise Great American of the Torpey Letter at the time it was sent. On July 16, 1992, CAT told Great American that it had "floated the idea" of a settlement which would not exceed the Policy's $10,000,000 retention. On March 18, 1993, Kirkland & Ellis, the firm that replaced Orrick as CAT's counsel, repeated the 1991 Offer to the plaintiffs without Great American's consent or knowledge (the "Kirkland Offer"). On April 29, 1993, Great American first learned of the 1991 Offer, the Torpey Letter, and the Kirkland Offer from CAT.

In February 1994, CAT requested Great American's written consent to settle the *Kas*

litigation for not less than $17,250,000. In a letter dated February 9, 1994, Great American consented in writing to the proposed settlement. Great American stated that "the proposed settlement is acceptable given the circumstances," and Great American stated that it did

> not waive any of its rights under the Policy, at law, or in equity to deny coverage for all or part of Caterpillar's loss. Great American continues to maintain a full reservation of rights, including but not limited to those issues detailed in our previous correspondence with Caterpillar and in the meeting at your offices on January 28.

The Court ultimately approved a settlement valued between $17,250,000 and $23,000,000. Great American argues that by CAT making and republishing an initial settlement offer which was worth several times more than the actual settlement value, an artificial and unnecessarily high floor for future settlement negotiations was created and CAT had violated Sections VI.A. and VI.C. of the Insurance Policy.

■ Section VI.A. provides:

> The Directors or Officers shall not admit liability for, or settle, any Claim or incur Costs of Defense in connection with any Claim, without the Insurer's prior written consent, which consent shall not be unreasonably withheld. The Insurance shall be entitled to full information and all particulars it may request in order to reach a decision as to such consent. Any Costs of Defense incurred and/or settlements agreed to prior to the Insurer consent thereto shall not be covered hereunder.

Great American argues that Section VI.A. precludes CAT from making a settlement offer which would unreasonably impact insurance coverage without first consulting Great American. According to Great American, the only way for CAT to comply with Section VI.A would have been to seek Great American's consent before making any offer that would involve the coverage. Great American maintains that if the 1991 Offer or Torpey Letter had been disclosed to Great American, it would have withheld consent on the ground that the offer was too high and would have urged a more reasonable starting point.

That may be, but Section VI.A. does not state anything about CAT needing to obtain Great American's consent prior to making a settlement offer, and there is no basis for inferring such an obligation. Section VI.A. clearly prohibited CAT from admitting liability for or settling any claim without Great American's prior written consent, which Great American could not unreasonably withhold. CAT neither admitted liability nor settled the *Kas* case without obtaining Great American's prior written consent. Section VI.A unambiguously did not require CAT to notify Great American prior to making a settlement offer to the *Kas* plaintiffs, and CAT complied with the requirements of Section VI.A.

■ Great American also contends that CAT violated Section VI.C. Section VI.C provides:

> The Insurer shall at all times have the right, but not the duty, to associate with the Directors or Officers in the investigation, defense or settlement of any Claim, to which this Policy may apply.

Great American claims that Section VI.C required CAT to inform it of any settlement offer prior to publication to the *Kas* plaintiffs. Does the phrase "shall have the right to associate with ... the defense or settlement of any Claim" unambiguously require CAT to at least notify Great American prior to the communication of any settlement offers to the *Kas* plaintiffs? The Policy does not define the phrase "associate with ... the defense or settlement of any Claim." Section VI.A provides that CAT could not settle any claim without obtaining Great American's prior written consent. Reading all provisions of the Policy together, it is clear that "associate with ... the defense or settlement of any Claim" means something different than requiring CAT to obtain Great American's written consent prior to actually settling a claim. However, whether "associate with.... the defense or settlement of any Claim" obligated CAT to notify Great American and receive its consent prior to making any settlement offers to the *Kas* plaintiffs is ambiguous.

The Court invited the parties to submit extrinsic evidence that would resolve the ambiguity. The parties have not submitted any evidence beyond the original pleadings on the meaning of this phrase. CAT states that it did not submit counter-affidavits on the issue of whether CAT actually made prior settlement offers to the *Kas* plaintiffs without Great American's knowledge or consent, "asserting instead that evidence on the notice and prejudice issue was legally irrelevant because Caterpillar and the Individual Defendants had no obligation to advise Great American of any settlement offers they intended to, or did make, to the Kas plaintiffs." Caterpillar's Additional Proposed Findings of Fact, p. 2. Therefore, the Court does not know whether a factual dispute exists between the parties on this issue. However, even if CAT disputes the allegation that it made prior settlement offers to the *Kas* plaintiffs with Great American's knowledge or consent, no genuine issue as to any material fact exists as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. at 2510 (A "material fact" exists only if there is a factual dispute that is outcome determinative under governing law.).

According to Section VI.B, the directors and officers, not Great American, had the duty to defend the *Kas* litigation. Therefore, Section VI.C means that although Great American did not have a duty to defend, it could be as involved in the *Kas* litigation as it wanted. Section VI.C could mean exactly what Great American now wants it to mean, but it was up to Great American to specifically communicate the type and amount of involvement it expected in the *Kas* litigation. Prior to April 29, 1993, the date Great American first learned from CAT of the existence of the 1991 Offer, the Torpey Letter, and the Kirkland Offer, neither Great American nor its counsel requested that CAT or the individual defendants advise Great American in advance of settlement offers they intended to make, or after the fact as to any offers which had been made to the *Kas* plaintiffs.

In a letter dated October 12, 1990, Mr. William Bila wrote a letter to Mr. Tom Mayer of CAT. The letter contained Great American's comments regarding the application of Sections I., III.D., III.E., III.F., IV. B., IV.E., IV.K., IV.L., and V.B. of the Policy. The final paragraph of that letter stated:

We ask that you and counsel [CAT] furnish us [Great American] with copies of reports, investigations, pleadings, dispositive motions, briefs, court orders and other pertinent documents on a current basis, and provide us with periodic reports on the status of the litigation, as provided in Section VII.C.

Great American does not contend that CAT violated Section VII of the policy. (Transcript of 5/16/94 Hearing at 42). In a letter dated August 15, 1990, Mr. Mayer wrote a letter to Mr. Bila stating that CAT would keep Great American "informed of developments as they occur." In letters dated January 2, 1991 and March 4, 1991, Mr. Atterbury stated he would keep Mr. Bila "informed of developments as they occur." Mr. Bila's October 12, 1990 letter does not refer to Section VI.C or state that Great American wanted to be notified prior to publication of a settlement offer, and the statements by Messrs. Mayer and Atterbury of CAT did not specifically promise that Great American would be advised of any settlement offers before their publication.

Great American may have assumed that being "advised of developments in [the settlement] area" would include notice of any settlement offers prior to their publication to the *Kas* plaintiffs. However, CAT was not obligated under the terms of the Policy to give prior notice of settlement offers unless Great American had made such a request. Under the Policy, CAT was only required to receive Great American's written consent prior to settling the case, and CAT's statements do not modify the terms of the Policy. Perhaps Great American could argue that it was lulled into a false sense of security by CAT's statements and would have asked ·for notice of settlement offers before their publication if CAT had not made such statements, but Great American does not make that argument. If Great American had wanted to assure that it would be informed of any settlement offers prior to publication, it was its burden to assert its right to that information under Section VI.C. of the Policy. The

record lacks any evidence that Great American specifically requested that CAT inform it of any settlement offers prior to publication to the *Kas* plaintiffs. If Great American had made such a request and CAT had not complied, then a breach of Section VI.C would have occurred.

Finally, Great American argues that CAT breached its duty under Illinois law to defend the underlying litigation in a reasonable and prudent manner. Great American relies on *La Rotunda v. Royal Globe Ins. Co.*, 87 Ill.App.3d 446, 42 Ill.Dec. 219, 408 N.E.2d 928 (1980), *Conway v. Country Casualty Ins. Co.*, 92 Ill.2d 388, 65 Ill.Dec. 934, 937, 442 N.E.2d 245, 248 (1982), and *National Union Fire Insurance Co. v. Continental Illinois Corp.*, 673 F.Supp. 267 (N.D.Ill.1987) for the proposition that an insurer is not liable for the amount of an unreasonable settlement or a settlement made in bad faith. However, these cases involved an insurer's breach of a duty to defend or a duty to settle. When that occurs, the insured is allowed to make a reasonable settlement on its own but can only enforce a settlement that is reasonable and made in good faith. These cases are not applicable to this case. The *Kas* defendant directors and officers had the duty to defend and Great American did not refuse to settle.

### III. 28 U.S.C. § 1292(b) Certification

Both CAT and Great American agree that the allocation issue meets the statutory prerequisites of 28 U.S.C. § 1292(b). Great American contends that the issue of whether CAT breached Sections VI.A. and VI.C. of the Policy and common law duties when it failed to notify Great American prior to communicating settlement offers to opposing counsel is also properly certified for immediate appeal. The Court finds that an immediate appeal of both of these issues may materially advance the ultimate termination of this litigation.

Section 1292(b) provides in pertinent part: When a district judge, in making in a civil action an order otherwise not appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

The Court finds that the allocation issue involves a controlling issue of law as to which there is a substantial difference of opinion in the caselaw. A recent Practicing Law Institute order has noted the different allocation approaches the courts have used to allocate settlement amounts:

The predominant rule is that the courts will look to the "relative exposure" of the parties in determining a fair and appropriate allocation of settlement amounts. There is also some support for the argument that allocation for settlements should take into account the relative benefit each of the parties receives from the settlement of the litigation. Support for this later proposition is found in the *PepsiCo* and *Perini* decisions.

The essential problem with the "relative liability exposure" rule is that there are widely differing views about the potential liability of directors, officers, corporations and others. This is particularly so in the context of securities fraud actions. Here, there is great controversy over the nature and extent of corporate liability. Given the significance of securities fraud as a percentage of all claims against, and losses incurred by, directors and officers, the issue of corporate liability in these cases becomes a paramount concern for the D & O insurer.

The *Harbor* and *Nordstrom* decisions are the most troubling in this regard because in each case the court was persuaded that corporate liability was primarily, if not entirely, vicarious—arising from the conduct of the directors and officers. In each case, the court acknowledged that corporate liability might arise independent of director and officer conduct based upon employee or management (non-officer/director) conduct, but the courts were essentially convinced that the corporate defendants would not be exposed to liability but for the conduct of the defendant directors and officers.

Notwithstanding the decisions in *Harbor* and *Nordstrom*, there is important legal precedent on corporate liability in securities fraud actions which supports a greater allocation of liability to the corporation. First, the corporation may not avail itself of the "good faith" defense readily available to director and officer defendants. Thus, while the D & O defendants can take the stand at trial and testify about "honest mistakes of judgment", the corporate defendant has no such opportunity.

It has also been stated that "scienter" is more easily provable against the corporation because of the "collective" proofs of knowledge and intent on the part of all directors, officers and employees. Support for this argument is found in the *In re Warner Communications* decision.

There is also some recognition in the case law for consideration of practical and strategic factors in evaluating relative liability. For example, the corporation is often considered to be a "deep pocket" defendant, and sometimes a "target" defendant. Even in the *Nodaway* decision, the court spoke of the "vulnerability" of the corporate defendant.

Wayne E. Borgeest, Paul C. Rowe, Carmine Venezia, *Current Issues in Directors and Officers Liability Insurance*, Practicing Law Institute Order No. H4–5184, 495 PLI/Lit 379 (January–February 1994). *See also Ameriwood Industries International Corporation v. American Casualty Company of Reading*, 1994 WL 396089, at *5–7, (W.D.Mich. July 27, 1994). Before extensive discovery on the issue of whether the *Kas* settlement amount was increased by the acts of uninsured persons or persons against whom no claim was made, it would be efficient to have Seventh Circuit clarification and guidance on whether an allocation should take into account CAT's potential direct, not derivative, liability in the underlying suit, and the benefit CAT received from the settlement of the underlying litigation. *See Johnson v. Burken*, 930 F.2d 1202, 1206 (7th Cir.1991) (" '[A] question is controlling, even though its decision might not lead to reversal on appeal, if interlocutory reversal might save time for the district court, and time and expense for the litigants.' ").

The Court further finds that the issue of whether CAT breached Sections VI.A and VI.C of the Policy by making settlement offers without Great American's prior knowledge or consent also satisfies the requirements of § 1292(b). The Court has ruled that reasonable persons could differ on the meaning of Section VI.C. Therefore, a substantial ground for difference of opinion exists on whether Section VI.C required CAT to notify Great American and receive its consent prior to the publication of settlement offers. An immediate appeal of the Court's rulings on the Policy's notice provisions may materially advance the ultimate termination of the case. If the Court's ruling on either Section VI.A or VI.C is reversed and a violation of either section is found, then under the Illinois Amendatory Endorsement, "no action shall lie" against Great American.

## CONCLUSION

For the reasons set forth above, CAT's motion for partial summary judgment as to Count 1 is granted in part and denied in part. CAT is entitled to reimbursement for the full amount of the settlement above the $10,000,-000 retention subject to Great American's right to demonstrate that the settlement amount was increased by the activities of uninsured persons or persons against whom no claim was made. CAT's failure to notify Great American of settlement offers prior to their publication to the *Kas* plaintiffs did not, based on the record of this case, breach Sections VI.A and VI.C of the Policy. The Court certifies this ruling for an immediate appeal under 28 U.S.C. § 1292(b).