[No. 13982–7–I.   Division One.   August 25, 1986.]

PRUDENTIAL PROPERTY AND CASUALTY INSURANCE COMPANY,
*Appellant,* v. JOSEPH L. LAWRENCE,
ET AL, *Respondents.*

*George H. Bovingdon* and *Clarke, Bovingdon & Cole,* for appellant.

*Carlos Velategui,* for respondents.

HOLMAN, J.*—Prudential Property and Casualty Insurance Company, the plaintiff in a declaratory judgment action below, appeals a determination that the term "property damage" as used in two insurance policies issued to Joseph and Julie Lawrence, the defendants below, was ambiguous and that Prudential was therefore obligated to provide coverage and to defend the Lawrences when neighbors brought suit alleging that the Lawrences' new home obstructed their view. Prudential also appeals the award of attorney's fees in connection with the coverage determination. We affirm.

This appeal arises out of an earlier lawsuit, Erion v. Lawrence (hereinafter the Erion action), between the Lawrences and their neighbors. In late August 1981, Prudential

---

*Judge Francis E. Holman is serving as a judge pro tempore of the Court of Appeals pursuant to RCW 2.06.150.

issued two policies of insurance to the Lawrences: (1) "Easy Reading Homeowners 3 Policy" No. 6H402961 (Homeowner's); and (2) "Easy Reading Personal Catastrophe Liability Policy" No. 6U002218M (Catastrophe). In September 1981, the Lawrences began construction of a new home in the town of Clyde Hill, a municipality on the east side of Lake Washington. In late October, the Lawrences learned that their neighbors, the Erions, objected to the placement of the Lawrences' house, contending it obstructed their view. The Lawrences received a formal letter of protest from the Erions' counsel on October 27, 1981. In response, the Lawrences hired the law firm of Buck & Gordon to represent them in the possible litigation.

On November 5, 1981, the Erions filed suit against the Lawrences and the town of Clyde Hill. The complaint alleged that the Lawrences had built their home too close to the street, in violation of the zoning ordinance and restrictive covenants, and alleged "damages for obstruction of their view in the past, continuing obstruction of their view, breach of the covenant of quiet enjoyment of their property and emotional distress." The Erions sought injunctive relief to prevent further construction on the house, as well as "such other additional relief as may seem just and equitable to the court."

The trial judge denied the Erions' request for a temporary restraining order and set the case for trial. On November 9, 1981, Lawrence notified his Prudential agent by letter and by telephone of the Erion action, and by letter dated November 10, 1981, tendered defense of the suit to Prudential. Throughout this period Buck & Gordon provided legal services to the Lawrences in connection with the action.

Prudential contacted its attorney for the first time regarding the claim on December 14, 1981. The attorney was instructed to "handle" the matter, but no restrictions were placed on his participation. Prudential was aware at this time that settlement negotiations were in progress. Prudential's attorney reviewed the proposed settlement and

reported to Prudential that it was a "good one."

The Erion action was settled on or about December 24, 1981. The agreement provided for payment of $18,000 by the Lawrences to the Erions and constituted "a full settlement of all disputes existing . . . as to anything relating to construction of the Lawrences' house . . ." Prudential then brought the instant declaratory judgment action, seeking a determination that the Lawrences' policies did not cover the alleged damages to the Erions' view and that Prudential had no obligation to defend the action. The Lawrences counterclaimed, asserting that the alleged damages came within the definition of "property damage" in both their Homeowner's and Catastrophe policies. Following trial, the judge ruled in favor of the Lawrences, concluding that the definition of "property damage" in the third–person liability sections of the two policies was ambiguous and that therefore the Erions' claim for obstruction of view was covered. The judge also found coverage under the first party section of the policies and awarded the Lawrences $18,000 for the settlement paid to the Erions, approximately $17,000 in attorney's fees incurred by the Lawrences in defending the Erion action, and approximately $11,600 in attorney's fees incurred by the Lawrences in defending the declaratory judgment action brought by Prudential. This appeal ensued.

Prudential concedes that it had a duty to defend the Lawrences on the emotional distress allegations contained in the Erions' complaint and asserts that it, in fact, provided such a defense. The primary issue on appeal is therefore whether the trial court properly concluded that Prudential also had a duty to defend the "obstruction of view" claims. An insurer's duty to defend arises when the complaint is filed, and is to be determined from the allegations of the complaint. *Holland Am. Ins. Co. v. National Indem. Co.*, 75 Wn.2d 909, 911, 454 P.2d 383 (1969); *National Steel Constr. Co. v. National Union Fire Ins. Co.*, 14 Wn. App. 573, 575, 543 P.2d 642 (1975). The test is "whether the facts alleged in the complaint, if proved,

would render the insurer liable under the policy." *Transamerica Ins. Co. v. Preston,* 30 Wn. App. 101, 103, 632 P.2d 900 (1981). Thus, a duty to defend arises when, on the basis of the allegations in the complaint, there would be a duty to pay. *Preston.* To this end the pleadings must be liberally construed. If they are subject to an interpretation that creates a duty to defend, the insurer must comply with that duty. *Travelers Ins. Cos. v. North Seattle Christian & Missionary Alliance,* 32 Wn. App. 836, 840, 650 P.2d 250 (1982); *R.A. Hanson Co. v. Aetna Ins. Co.,* 26 Wn. App. 290, 612 P.2d 456 (1980).

With respect to the "obstruction of view" claim, Prudential relies primarily on the language in the Homeowner's policy. The Homeowner's policy provides that Prudential will pay for damages and provide a defense if "a claim is made or suit is brought against any insured for damages because of bodily injury or property damage . . ." "Property damage" is defined in the Homeowner's policy as: "*physical injury* to or destruction of tangible property, including loss of use of this property." (Italics ours.) Prudential apparently does not argue that "obstruction of view," whatever kind of injury it might be, is not injury to tangible property, *i.e.,* the Erions' house. Rather, Prudential asserts that the Erions' claim regarding "obstruction of view" is clearly outside the scope of the Homeowner's policy because such allegations cannot reasonably be construed as physical injury. The trial court concluded that the term "destruction" was ambiguous when applied in an economic sense to loss of view and construed the clause against Prudential.

Neither party in this dispute has cited any authority construing "physical injury to or destruction of tangible property. . . ." Several courts, however, have tussled with this phrase and agree, in general, with Prudential's position. In *Wyoming Sawmills, Inc. v. Transportation Ins. Co.,* 282 Or. 401, 578 P.2d 1253 (1978), the Oregon Supreme Court interpreted "property damage," which had been defined in a comprehensive liability policy as "physical

injury to or destruction of tangible property." The insured had sold defective studs that were subsequently incorporated into a building. The insured settled a claim for the labor expenses in replacing the defective studs and then sought coverage from its insurer. In determining that the labor expenses were not "property damage" within the meaning of the policy, the court distinguished a line of decisions holding that the integration of a defective product into a large entity constitutes "property damage" if the entity has been diminished in value by the defective product, even though no physical damage has occurred:

> Insofar as we can determine, none of the policies involved in the cases on which plaintiff relies contained the same definition of "property damage" as that which is contained in the present policy. The present policy defines property damage as "*physical* injury to * * * tangible property." (Emphasis added.) Apparently, none of the policies involved in the cases which are the basis for plaintiff's contention included the word "physical." The inclusion of this word negates any possibility that the policy was intended to include "consequential or intangible damage," such as depreciation in value, within the term "property damage." The intention to exclude such coverage can be the only reason for the addition of the word. As a result, in the absence of a showing that any physical damage was caused to the rest of the building by the defective studs and that the labor cost was for the rectification of any such damage, plaintiff cannot recover.

(Footnote omitted.) *Wyoming Sawmills*, at 406–07. *See also Triple U Enters. v. New Hampshire Ins. Co.*, 576 F. Supp. 798 (D.S.D. 1983) (allegations that buffalo calves born from brucellosis–infected breeding stock sold by insured involved "property damage" defined in insured's liability policy as "physical injury to or destruction of tangible property"), *aff'd in part, remanded in part on other grounds*, 766 F.2d 1278 (8th Cir. 1985); *State v. Glens Falls Ins. Co.*, 132 Vt. 97, 100, 315 A.2d 257 (1974) ("mysterious" disappearance of colored slides not "physical injury to or destruction of tangible property"); *General Ins. Co. of Am.*

*v. Palmetto Bank,* 268 S.C. 355, 233 S.E.2d 699 (1977) (wrongful deprivation of property not injury to property); Restatement (Second) of Torts § 7 (1965) ("physical harm" used throughout Restatement "to denote the physical impairment of . . . land or chattels").

We need not, however, determine whether a similar analysis would apply to allegations regarding "obstruction of view" in the context of the definition in the Homeowner's policy because we base our decision on the significantly different definition of "property damage" contained in the Lawrences' Catastrophe policy. In general, the Catastrophe policy provides coverage "only after the limits of the underlying insurance and of all other collectible insurance covering the claim have been paid by or for [the insured]." In the instant case, Prudential itself provided the required underlying insurance, the Homeowner's policy. Consequently, the Catastrophe policy, by its own terms, provides "coverage at least as broad as our underlying insurance policy." The Homeowner's and Catastrophe policies must therefore be read and construed together.

█ Under the terms of the Catastrophe policy, Prudential agreed to pay the sums the insured became obligated to pay as damages because of "property damage." "Property damage" is defined as: "damage to or destruction of tangible property. 'Property damage' also includes the loss of the use of the damaged or destroyed property." Thus, unlike the Homeowner's policy, the Catastrophe policy does not require *physical* injury to tangible property. Language similar to that in the Catastrophe policy has been broadly construed to encompass damage involving diminution in the value of property, even when no physical damage has otherwise occurred. *Cf. Yakima Cement Prods. Co. v. Great Am. Ins. Co.,* 93 Wn.2d 210, 218, 608 P.2d 254 (1980) (presence of defective product in otherwise sound structure is property damage within terms of product liability insurance if value of structure diminished by integration of defective products). Such language does not require *tangible* damage to tangible property. *Yakima Cement Prods.,* at

219 (citing *Labberton v. General Cas. Co. of Am.,* 53 Wn.2d 180, 332 P.2d 250 (1958); *General Ins. Co. of Am. v. Gauger,* 13 Wn. App. 928, 538 P.2d 563 (1975)).

Undefined terms in an insurance contract must be given their popular and ordinary meaning. *Harrison Plumbing & Heating, Inc. v. New Hampshire Ins. Group,* 37 Wn. App. 621, 624, 681 P.2d 875 (1984). "Damage" means "loss due to injury: injury or harm to person, property, or reputation". "Destruction" means "impairment, disruption, disintegration". "Use" means, among other things, "the act . . . of using something . . . the privilege or benefit of using something". *See Webster's Third New International Dictionary* (1969).

"Obstruction of view," as alleged in the Erions' complaint, damages tangible property in an economic sense, for it may result in a diminution of property value. In addition, "obstruction of view" also may impair the beneficial use and enjoyment of tangible property:

> "Property in a thing consists not merely in its ownership and possession, but in the unrestricted right of use, enjoyment, and disposal. Anything which destroys one or more of these elements of property to that extent destroys the property itself.

*Labberton v. General Cas. Co. of Am., supra* at 187 (quoting *Gasque v. Conway,* 194 S.C. 15, 8 S.E.2d 871 (1940)). We therefore find that the allegations regarding obstruction of view as contained in the Erions' complaint were property damage as defined in the Lawrences' Catastrophe policy. Even if we were to accept Prudential's definition as an additional reasonable interpretation of the provision, the general rules of construction would require adoption of the interpretation most favorable to the insured. *See Nautilus, Inc. v. Transamerica Title Ins. Co.,* 13 Wn. App. 345, 349, 534 P.2d 1388 (1975). Prudential therefore had a duty to defend, and the Lawrences were entitled to recover the amount of the settlement paid to the Erions and the expenses of defending the action.

Our construction of the Catastrophe policy as providing

coverage for "property damage" that might not be included in the underlying policy is in accord with both the express language of the Lawrences' Catastrophe policy and the general purposes underlying catastrophe or umbrella policies. The following provision belies Prudential's assertion that the Catastrophe policy provided solely excess coverage:

> If there is no required underlying insurance that covers the claim, this policy will pay the amount you are legally obligated to pay over $500.

Thus, even if we were to assume that the different definition of "property damage" in the Homeowner's policy operated to exclude allegations regarding obstruction of view, we would still be required to ascertain, as we have done, whether coverage was independently provided by the Catastrophe policy. *Cf. County of Wyoming, N.Y. v. Erie Lackawanna Ry.*, 360 F. Supp. 1212 (W.D.N.Y. 1973) (catastrophe policy provided coverage for claim not within underlying policy), *aff'd*, 518 F.2d 23 (2d Cir. 1975).

■ The very nomenclature chosen to designate umbrella or catastrophe policies suggests an intent to protect against gaps in the underlying policy. *See Bryan Constr. Co. v. Employers' Surplus Lines Ins. Co.*, 60 N.J. 375, 290 A.2d 138, 139–40 (1972). As stated by one authority:

> It should be noted that [catastrophe and umbrella] policies often provide a primary coverage in areas which might not be included in the basic coverage, since it is the intent of the company to afford a comprehensive protection in order that such peace of mind may truly be enjoyed. In those areas, such coverage will, in fact, be primary.

8A J. Appleman, *Insurance* § 4909.85, at 452–53 (1981). Moreover, in the instant case Prudential drafted both the Catastrophe and the underlying policies. Had it intended to restrict the scope of the "property damage" definition it easily could have done so by adopting the same definition contained in the Homeowner's policy.

Our conclusion that Prudential had a duty to defend the Lawrences on the obstruction of view claim is also determi-

native of the remaining issues regarding attorney's fees. Prudential argues that its duty to defend was limited in any event because the Erions' complaint requested primarily injunctive relief. Although an insurance company has no obligation to defend in proceedings that are solely equitable in nature, a duty to defend arises when damages otherwise within coverage are sought in an equitable action for an injunction. *See* 7C J. Appleman, *Insurance* § 4685, at 121 (1979); 14 G. Couch, *Insurance* § 51:37, at 448 (2d rev. ed. 1982); 44 Am. Jur. 2d *Insurance* § 1536, at 416 (1969); *Seaboard Sur. Co. v. Ralph Williams' Northwest Chrysler Plymouth, Inc.*, 81 Wn.2d 740, 744–47, 504 P.2d 1139 (1973).

When a complaint alleges several causes of action, some of which are covered and some of which are not, the insurer is obligated to defend only those actions that fall within the scope of coverage. *Seaboard Sur. Co. v. Ralph Williams' Northwest Chrysler Plymouth, Inc., supra* at 741 n.1. In the instant case, the Erions sought not only injunctive relief, but also damages for emotional distress and "such additional relief as may seem just and equitable," allegations that would permit an award of monetary damages. *See, e.g., Black v. Evergreen Land Developers, Inc.*, 75 Wn.2d 241, 252, 450 P.2d 470 (1969). Moreover, when

> a claim for damages is asserted upon more than one theory of recovery, and the suit is settled or goes to the jury with no interrogatories which will enable the jury to state the findings on which it bases its verdict for the claimant, an insurer who refused to defend the action is estopped to assert that the claim was not covered.

*Waite v. Aetna Cas. & Sur. Co.*, 77 Wn.2d 850, 856, 467 P.2d 847 (1970); *see also National Steel Constr. Co. v. National Union Fire Ins. Co.*, 14 Wn. App. 573, 576, 543 P.2d 642 (1975).

The trial court's finding that Prudential made no attempt to segregate the settlement in the instant case is amply supported. Prudential's own witness, Mr. Betts, testified that he would attempt to establish, either through jury interrogatories or through an understanding of the

parties, which part of the judgment or settlement would be applied to which allegation. The settlement agreement itself specified only that it involved "all claims" of the parties. Consequently, the trial court did not err in ordering Prudential to pay the entire settlement.

The record indicates that a substantial portion of the legal fees incurred by the Lawrences in response to the Erion action arose prior to November 10, 1981, when Lawrence tendered defense of the claim to Prudential. Prudential argues that it is unfair to assess fees incurred prior to a time when it could have supplied counsel. However, when an insurer wrongfully refuses to defend and there is no reasonable means of prorating the costs of defense between those items that are covered and those that are not covered, the insurer is liable for the entire cost of the defense. *National Steel Constr. Co. v. National Union Fire Ins. Co., supra* at 576; *Waite v. Aetna Cas. & Sur. Co., supra* at 856; Annot., 41 A.L.R.2d 434, 436 (1955).

In the instant case, the record supports the trial court's finding that the Lawrences acted reasonably and did not violate conditions of the policy in notifying Prudential. We agree with the trial court's conclusion that there was no way to segregate the covered claims and associated costs from any uncovered claims. Because of the nature of the Erion action and the fact that their new home was approximately 40 percent completed, the Lawrences were required to take immediate legal steps to forestall potentially severe consequences. Such prompt action may under certain circumstances serve to mitigate the damages that might otherwise be required from an insurer that subsequently provides coverage and defends.

Prudential, upon the Lawrences' tender of defense, waited approximately 1 month before even contacting its own attorney regarding the matter. Even though Prudential contends that it was supplying a defense on the emotional distress claim, it made no effort to apportion the settlement or segregate attorney's fees, even though it had the opportunity to do so. Under these circumstances, we conclude

that Prudential was liable for the entire costs of the defense, even though some of the expenses arose prior to notification.

■ The trial court also did not err in awarding the Lawrences attorney's fees for defending the declaratory judgment action brought by Prudential. The Lawrences' Homeowner's policy provided that Prudential would pay "reasonable expenses incurred by any insured at our request, including actual loss of earnings." A similar provision was contained in the Catastrophe policy. An award of attorney's fees pursuant to such a clause is proper when an insurer seeks adjudication of its contractual duty to defend. *Farmers Ins. Co. v. Rees*, 96 Wn.2d 679, 683, 638 P.2d 580 (1982); *see also Smith v. Ohio Cas. Ins. Co.*, 37 Wn. App. 71, 75, 678 P.2d 829 (1984); *Travelers Ins. Cos. v. Seattle Christian & Missionary Alliance*, 32 Wn. App. 836, 845, 650 P.2d 250 (1982).

In the instant case, Prudential's complaint for declaratory judgment alleged that the policies did not cover the damages in the Erion action and that Prudential had no duty to defend the allegations for obstruction of view. It is undisputed that Prudential did little if anything with regard to the Lawrences' claim between November 10, 1981, when defense was tendered, and December 14, 1981, when Prudential requested David Gross to "handle" the matter for the Lawrences. Mr. Sorenson, Prudential's casualty supervisor, testified that Prudential had not yet decided as of December 14 whether the Erion claim was covered. Prudential also knew at an early date that the parties were in the process of negotiating a settlement, but made no request that the settlement amount be segregated in accordance with the allegations in the original complaint. Although Prudential did not explicitly refuse the tender of defense, it did not actively undertake a defense either. In the words of Prudential's counsel during closing argument at trial, Prudential "equivocated for awhile."

Finally, pursuant to RAP 18.1, the Lawrences should be awarded their attorneys' fees and costs for defending this

appeal. Their counsel has provided an affidavit disclosing a total of office time and court appearances at various times over a 2–year period aggregating 72 hours, which we find to be reasonable for a matter of this kind. At his rate of $90 per hour, which is well within reason, his fee for services on this appeal up to the time of oral argument totals $6,480, to which we would add $150 for oral argument and $179.25 for necessary disbursements.

In light of our resolution of this case, we decline the trial court's invitation to determine whether the same result would obtain under the first party provisions of the Lawrences' policies.

The judgment is affirmed.

SWANSON and WEBSTER, JJ., concur.