**NORDSTROM, INC., a Washington Corporation, Plaintiff–Appellee,**

v.

**CHUBB & SON, INC., a New York corporation dba Chubb or The Chubb Group of Insurance Companies; Federal Insurance Company, an Indiana corporation dba Chubb or The Chubb Group of Insurance Companies, Defendants–Appellants.**

No. 93–35495.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 13, 1994.

Decided April 14, 1995.

As Amended on Denial of Rehearing and Rejection of Suggestion for Rehearing En Banc Aug. 1, 1995.*

* Judge Hall voted to reject the suggestion for rehearing en banc, and Judges Goodwin and   D.W. Nelson recommended rejection of the suggestion for rehearing en banc.

Peter W. Davis, Crosby, Heafey, Roach & May, Oakland, CA, for defendant-appellant.

Larry S. Gangnes, Lane, Powell, Spears, Lubersky, Seattle, WA, for plaintiff-appellee.

Michael L. Charlson, Heller, Ehrman, White & McAuliffe, San Francisco, CA, for amicus curiae American Electronics Ass'n, Network Equipment Technologies, Inc., Silicon Graphics Corp., and VLSI, Inc.

David W. Steuber, Kirk A. Pasich and Michael A. Rossi, Hill Wynne Troop & Meisinger, Los Angeles, CA, for amicus curiae Pacific Enterprises.

Rex E. Lee, Sidley & Austin, Washington, DC, for amicus curiae Aetna Life & Cas. Co., CNA Ins. Cos., The Home Ins. Co., Old Republic Ins. Co., Reliance Ins. Co., and Zurich Ins. Co.

Before: GOODWIN, D.W. NELSON, and HALL, Circuit Judges.

D.W. NELSON, Circuit Judge:

Federal Insurance Company and its managing agent, Chubb & Son, Inc., (collectively, "Federal") appeal the district court's grant of summary judgment in favor of Nordstrom, Inc. ("Nordstrom") in an insurance coverage dispute. In 1990, various groups of Nordstrom shareholders brought class action suits alleging securities fraud against Nordstrom and its directors and officers. These suits were consolidated, and the parties eventually reached a $7.5 million settlement. Federal, which had issued Nordstrom a policy covering "all loss" stemming from the wrongful acts of corporate directors and officers (the "D & O policy"), consented to the settlement. Federal, however, only agreed to fund half of the settlement and half of the defense costs because both individual directors and officers of Nordstrom (insured entities) and the corporation (an uninsured entity) were named as defendants in the underlying suit. Nordstrom subsequently brought this diversity action in federal district court, claiming that the policy covered the entire settlement sum. The district court granted Nordstrom's motions for summary judgment. *Nordstrom, Inc. v. Chubb & Son, Inc.*, 820 F.Supp. 530, 537 (W.D.Wash.1992). We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## BACKGROUND

The present coverage dispute stems from the settlement of a class action suit against Nordstrom and six named directors and officers of Nordstrom. The underlying suit alleged that, in 1989 and 1990, Nordstrom fraudulently concealed from investors the existence of material adverse risks arising out of a company-wide policy requiring Nordstrom employees to work "off-the-clock." In 1989, the union for some of Nordstrom's Washington employees challenged this policy. In its annual report for the fiscal year ending January 31, 1989, and in subsequent quarterly reports, Nordstrom made no mention of the potential liability and other risks facing it because of its labor practices. In late 1989 and early 1990, Nordstrom consistently denied that the union's allegations had any merit, and Nordstrom spokespersons issued numerous public statements and press re-

leases downplaying the importance of the allegations. On February 15, 1990, following an investigation, the Washington Department of Labor and Industries issued a report concluding that Nordstrom was in violation of Washington's wage laws. On February 16, 1990, Nordstrom's stock price dropped by ten percent. The stock price fell again the following day.

Nordstrom shareholders filed securities fraud class action suits in both federal and state court. The separate actions eventually were consolidated into a single class action complaint that set forth allegations of securities fraud and common law misrepresentation in five counts. The first four counts alleged that Nordstrom and the named directors and officers had violated: (1) Section 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§ 78j(b), 78t, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; (2) the Washington State Securities Act, Wash.Rev.Code § 21.20.010 et seq.; (3) the common law of negligent misrepresentation; and (4) the Washington Consumer Protection Act, Wash.Rev.Code § 19.86.020, 19.86.090. The fifth count, directed solely against the named directors and officers, alleged that, as "controlling persons" under section 20(a) of the 1934 Act, each was liable for the acts of all other Nordstrom employees involved in the alleged fraud.

After the suit was filed, Nordstrom gave notice to Federal, the issuer of Nordstrom's D & O policy. Pursuant to the policy, Federal agreed to reimburse Nordstrom for defense costs subject to "an appropriate allocation as between covered and non-covered defendants, potentially non-covered claims, and satisfaction of the deductible amount." Beginning in March 1991, Federal, through its attorney, Patrick Kelly, conducted an inquiry into the merits of the class action suit. Nordstrom attorneys provided information about the suit to Kelly, who interviewed several Nordstrom officers and employees. Joseph Demarte, who was in charge of personnel at Nordstrom and responsible for the initial Nordstrom investigation into the union's labor violations charges, told Kelly that he had concluded that, although there were some isolated instances of abuse by Nordstrom store managers, "there was little if any validity to the charges by the union." Demarte also told Kelly that he had communicated his findings to his Nordstrom superiors.

The Nordstrom directors and officers, including co-chairmen John Nordstrom, Bruce Nordstrom, and James Nordstrom, told Kelly that although they knew from Demarte's report that there had been "isolated instances of abuse," they believed that Nordstrom had done nothing wrong, based both on reports from Demarte and personal inquiries of regional managers made by James Nordstrom. Two of the directors and officers, as well as public relations director Chris Bridenbaugh, acknowledged that the press disclosures on this matter were reviewed by a member of the Nordstrom family.

In April 1991, settlement negotiations began before United States District Judge William L. Dwyer. Federal was represented by counsel at the settlement conferences. The parties eventually agreed to a settlement figure of $7.5 million, with the corporate entity and the individual directors and officers jointly and severally liable for the sum.

On May 10, 1991, Federal consented to the settlement as reasonable, stating in writing that its consent was conditioned "on the specific understanding that all parties reserve their rights to litigate . . . in resolving the allocation issues in this matter and that neither party is waiving any defense with respect to those allocation issues." Federal also agreed provisionally to fund one-half of the settlement ($3.75 million), subject to the outcome of any subsequent allocation. Federal only agreed to fund half the settlement because it contended that the uninsured corporate entity was partially responsible for the loss.

Although defense costs were not allocated at the time of the settlement, Federal subsequently agreed to fund half of Nordstrom's proffered defense costs as well, after first auditing Nordstrom's billing statements and deducting $10,800, which it deemed not subject to reimbursement under the policy. After the deduction, the total came to $1.072 million, of which Federal agreed to pay $536,000.

The D & O policy issued to Nordstrom by Federal provides in relevant part as follows:

> The Company shall pay on behalf of the Insured Organization *all Loss* for which the Insured Organization grants indemnification to each Insured Person, as permitted or required by law, *which the Insured Person has become legally obligated to pay* on account of any claim first made against him, *individually or otherwise,* during the Policy Period ... *for a Wrongful Act committed, attempted, or allegedly committed or attempted, by such Insured Person(s)* before or during the Policy Period. (emphasis added)

Although the policy alludes to an "appropriate allocation of defense costs" where both the corporate entity and directors and officers are named as defendants and where the insured consents to pay defense costs as incurred, it does not specifically provide for allocation of a settlement sum where a suit involves both covered and noncovered claims. The policy also provides for subrogation, and states in relevant part: "If any payment is made under this policy, the Company shall be subrogated to the extent of such payment to all the Insureds' rights of recovery."

In January 1992, Nordstrom brought this action seeking payment under the policy for the full amount of the settlement, claiming that the entirety of the defense costs and settlement sum represented a "loss ... which the Insured Person has become legally obligated to pay" within the meaning of the policy. The parties undertook document and interrogatory discovery to supplement the discovery that had taken place during the pendency of the class action suit. Nordstrom produced over 100,000 pages of documents to Federal, and provided a list of requested documents that it claimed were protected from disclosure under the attorney-client privilege and the work product doctrine. Federal claims that among the documents withheld from production were documents that set forth Nordstrom's attorneys' analysis of the corporation's exposure in the underlying suit at the time the settlement was reached.

On July 16, 1992, Nordstrom moved for partial summary judgment on its claims for full indemnification of the settlement and for defense costs. In response, Federal claimed that numerous issues of disputed fact remained concerning the allocation issues and asserted the necessity of further discovery to identify the disputed issues more precisely.

On October 9, 1992, the district court granted Nordstrom's motions for partial summary judgment, finding that Federal was liable for the entirety of the settlement over the deductible identified in the policy and for defense costs of $1.072 million, an amount which Federal attorneys had determined after their audit to have been "appropriate and reasonable." 820 F.Supp. at 532–37. The court also held that Federal was not entitled to further discovery. This timely appeal followed.

### STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo, reviewing all facts in the light most favorable to the nonmoving party. *Jesinger v. Nevada Federal Credit Union,* 24 F.3d 1127, 1130 (9th Cir. 1994). We affirm a grant of summary judgment if there are no genuine issues of material fact and if the district court correctly applied the relevant substantive law. *Id.*

The parties agree that Washington state law governs this diversity dispute. Under Washington law, insurance policies are construed as contracts, and interpretation of policies is a matter of law. *State Farm Gen. Ins. Co. v. Emerson,* 102 Wash.2d 477, 687 P.2d 1139, 1141–42 (1984). Policies are to "be given a fair, reasonable, and sensible construction" that comports with how the average purchaser of insurance would view the policy. *Grange Ins. Co. v. Brosseau,* 113 Wash.2d 91, 776 P.2d 123, 125 (1989). Generally, the burden is on the plaintiff in an action on an indemnity policy to show that the loss suffered comes within the terms of the insurance policy. *Waite v. Aetna Casualty & Sur. Co.,* 77 Wash.2d 850, 467 P.2d 847, 850 (1970).

### DISCUSSION

Federal's principal contention is that it should not be required to pay the entire

amount of the settlement agreement because the policy does not provide for indemnification to Nordstrom for liability arising out of claims made against the corporate entity. Because the corporate entity was named as a co-defendant in four of the five counts in the underlying complaint, Federal argues that it is necessary to determine whether any portion of the settlement sum was the exclusive responsibility of the corporate entity. *See Harbor Ins. Co. v. Continental Bank Corp.,* 922 F.2d 357, 359 (7th Cir.1990) (noting that a case with similar facts centered on "the interpretation of the insurance policy for directors' and officers' liability"). Under such an approach, Federal argues that the settlement amount should be allocated according to "the relative exposure of the respective parties." *PepsiCo, Inc. v. Continental Casualty Co.,* 640 F.Supp. 656, 662 (S.D.N.Y.1986) (requiring allocation between those amounts attributable to the directors and officers and those attributable to the company).

## I. Nordstrom's Threshold Contentions

Nordstrom offers three independent grounds to justify affirmance of the district court without reaching the merits of Federal's allocation arguments. First, Nordstrom contends that because the Federal policy lacks an express allocation clause, there is no basis for the present appeal, for Federal's only remedy is an action for subrogation. Second, Nordstrom contends that the joint and several liability provision of the settlement, by rendering the directors and officers "legally obligated to pay" the entire settlement sum, forecloses any right to allocation. Third, Nordstrom claims that Federal is estopped from asserting any right to allocation because it violated its duties under Washington law to investigate Nordstrom's claim promptly and to provide a reasoned explanation of the facts and law supporting its denial of coverage. We conclude that each of Nordstrom's contentions is without merit.

### A. Express Allocation Clause

■ Washington law does not prohibit allocation in the present context, despite the absence of an express allocation clause. Under Washington law, allocation is not permitted if an insurer has improperly refused to defend the insured against claims, *see Waite v. Aetna Casualty & Sur. Co.,* 77 Wash.2d 850, 467 P.2d 847, 852 (1970), or has made no attempt to separate out the portion of the settlement amount for which it was liable, *see Prudential Property & Casualty Ins. Co. v. Lawrence,* 45 Wash.App. 111, 724 P.2d 418, 424 (1986). In addition, allocation is not required when the covered and noncovered claims of a single insured party "consist of the same factual core." *Public Utility Dist. No. 1 v. International Ins. Co.* ("PUD"), 124 Wash.2d 789, 881 P.2d 1020, 1032 (1994). Yet in the present case, Federal did not refuse to defend and expressly conditioned its consent to the settlement on a later allocation, and the case involves claims against an uninsured party, the corporation.[1]

■ Outside of these narrow areas, Washington law permits allocation, even in the absence of an express allocation clause. *See Waite,* 467 P.2d at 853 (finding that allocation of damages among separate claims was proper); *cf. In re Estate of Rendsland,* 92 Wash.2d 185, 594 P.2d 1346, 1349 (1979) (finding that a settlement agreement impliedly allocated responsibility to pay inheritance taxes among the beneficiaries of the will).

■ In this instance, the lack of an express allocation clause in the policy should not be dispositive because the policy unambiguously covers only losses which "the Insured Person has become legally obligated to pay on account of any claim first made against him during the Policy Period ... for a wrongful Act ... allegedly committed ... by [an] Insured Person." Indeed, this action centers on the question whether any portion of the settlement sum is attributable to acts

---

1. In *PUD,* the issue was whether a single set of acts were negligent, and therefore covered, or intentional, and therefore noncovered. 881 P.2d at 1032. Here, the case involves not only covered and noncovered claims, but also covered and noncovered parties. *See id.* In addition, the claims against Nordstrom arising from actions by uninsured employees, arguably are factually distinct from the actions of the directors and officers. We decline to resolve the issue of whether the Washington Supreme Court would extend the rule of *PUD* to the present context.

of the corporate entity, a named defendant in the underlying class action suit, rather than to acts of the named directors and officers. If the factfinder were to conclude that the corporate entity's independent exposure accounts for a portion of the settlement sum, that part of the sum would not constitute a covered "loss" within the meaning of the policy. Accordingly, allocation would be necessary to reflect properly the terms of coverage under the policy. *See Waite,* 467 P.2d at 853; *Caterpillar Inc. v. Great American Ins. Co.,* 864 F.Supp. 849, 852 (C.D.Ill.1994) (finding that lack of express allocation clause did not preclude allocation); *PepsiCo,* 640 F.Supp. at 662; William E. Knepper & Dan A. Bailey, *Liability of Corporate Directors and Officers,* § 17.06 (4th ed. 1988 & Supp. 1992) ("Proper allocation ... among the insured and uninsured claims, persons, or entities is a procedure established by law and is a recognized practice of the insurance industry."). Contrary to Nordstrom's assertion, the policy's grant to Federal of subrogation rights against third parties who might be found liable for part of any judgment against the named directors and officers is irrelevant to the allocation issue because subrogation is appropriate only if coverage under the policy is first established. *Cf. Sequoia Ins. Co. v. Royal Ins. Co. of America,* 971 F.2d 1385, 1394 (9th Cir.1992) (noting that a subrogee is subject to all available theories of defense, including a theory of lack of coverage).

### B. Joint and Several Liability

█ Nordstrom's second argument fails because it misstates Federal's obligations under the policy. Nordstrom notes that the joint and several liability provision of the settlement makes the directors and officers legally responsible for the entire settlement sum, and asserts that the corporation properly indemnified the directors and officers for that amount. On this basis, Nordstrom reasons that full coverage is mandated by the policy's indemnification clause, which expressly provides that "[Federal] shall pay all loss for which [Nordstrom] grants indemnification to each Insured Person ... which the Insured Person has become legally obligated to pay on account of any claim first made against him during the Policy Period...."

The flaw in Nordstrom's argument is that this indemnification clause is modified by the following: *"for a Wrongful Act committed, attempted, or allegedly committed or attempted, by such Insured Person(s)* [during the Policy Period]." To the extent that the sum the directors and officers are "legally obligated to pay" under the joint and several settlement provision is not a result of their own "wrongful acts," but of acts attributable solely to the corporate entity, there is no coverage under the policy. *See PepsiCo,* 640 F.Supp. at 661–62 (authorizing allocation despite joint and several liability). Thus, although Washington law has not addressed this issue, we conclude that the joint and several settlement provision, by itself, does not obligate Federal to fund the entire settlement amount. *Cf. Waite,* 467 P.2d at 849, 853 (in case in which the insured was liable for all claims, considering the terms of the indemnity policy in assessing whether the insurer was responsible for the entire settlement amount).

### C. Estoppel

█ We reject Nordstrom's claim that Federal is estopped from denying full coverage under Washington law. Insurers have a duty to investigate claims promptly and may be estopped if they withhold possible bases for denial of coverage. *See Bosko v. Pitts & Still, Inc.,* 75 Wash.2d 856, 454 P.2d 229, 234 (1969). There is no indication in the record, however, that Federal was dilatory in investigating Nordstrom's claim. Federal and Nordstrom simply disagreed about the scope of coverage under the policy, and Federal reserved its rights to seek allocation later in order to facilitate the ongoing settlement negotiations. At the time it consented to the settlement, moreover, Federal expressly refused to fund the entire settlement because of alleged independent exposure of the corporate entity. Accordingly, we reject Nordstrom's threshold contentions and now turn to the merits.

### II. Allocation

#### A. Background Principles

█ Washington law has not addressed the issue of how a court should allocate set-

tlement payments and defense costs between directors and officers and the corporate entity when they are joined as co-defendants. Although we have held previously that an insurer providing D & O liability insurance may allocate defense costs between covered and noncovered claims, *Okada v. MGIC Indem. Corp.*, 823 F.2d 276, 282 (9th Cir.1986), we also have never addressed the precise issue presented in this case.

Under general principles of insurance law, "[a] D & O insurer is responsible for only the loss attributable for liability imposed by law upon the named insureds ... [and] has no responsibility for liability imposed on the corporation for its wrongful acts...." Knepper & Bailey, *supra*, § 17.06, Supp. at 246; *see also Waite*, 467 P.2d at 853 ("We know of no rule of law which would impose liability upon the respondent for claims against which it gave no insurance...."). The district court correctly stated the generally accepted principle that after a settlement, " 'the court is not required to resolve all fact and legal issues in the underlying case, but simply to determine what reasonable allocations should have been made [by the parties], considering uncertainties in both fact and law known at the time of the settlement.' " 820 F.Supp. at 535 (quoting *Nodaway Valley Bank v. Continental Cas. Co.*, 715 F.Supp. 1458, 1465 (W.D.Mo.1989), *aff'd*, 916 F.2d 1362 (8th Cir. 1990)); *see also PUD*, 881 P.2d at 1032 (stating that the insured need not prove the validity of claims, but need only show that the claims were within the scope of policy coverage); *Waite*, 467 P.2d at 853 (allowing allocation where there was a "reasonable basis").

In this instance, the underlying complaint alleges wrongdoing by both insured and uninsured parties, and the settlement agreement does not include a breakdown of the parties' proportional responsibility for the liability embodied in the settlement. The parties agree with the district court that, in order to determine the extent of coverage under the policy, "[t]he court must ... determine which class action claims would have exposed Nordstrom to liability independent of, rather than derivative from, its directors' and officers' liability." 820 F.Supp. at 531.

The parties, however, disagree over the precise considerations that should guide the court in determining the relative exposure of the corporate entity and the directors and officers. Nordstrom urges the court to adopt the "larger settlement rule," embraced by the Seventh Circuit, according to which responsibility for any portion of the settlement should be allocated away from the insured party *only if the acts of the uninsured party are determined to have increased the settlement. See Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 368 (7th Cir. 1990); *Caterpillar*, 864 F.Supp. at 853. This would only be true if the corporate entity alone were liable for a particular claim, or if its liability would exceed that of the directors and officers on any claim for which the corporation was independently but jointly liable.

Borrowing from the contribution context, Federal counters that relative exposure should be based on a measure of proportional fault. *See Smith v. Mulvaney*, 827 F.2d 558, 561 (9th Cir.1987) (applying a "relative culpability" measure in allocating contribution rights arising under Rule 10b–5 among settling and non-settling defendants). On Federal's theory, even if the court determines that the directors and officers would be found liable on all claims, the settlement sum still should be allocated between the corporation and the directors and officers where there is some independent basis, not derivative of the officers' and directors' liability, for holding the corporate entity liable.

We do not decide whether any given rule is generally applicable to all settlement agreements under D & O insurance policies. Rather, we consider the particular policy in question to determine which rule best effectuates the reasonable expectations and intentions of the parties under the insurance contract. *See Okada*, 823 F.2d at 281; *Transcontinental Ins. Co. v. Washington Pub. Utilities Districts' Util. Sys.*, 111 Wash.2d 452, 760 P.2d 337, 340 (1988) (reviewing policy to discern "the contract as the parties intended"). In this instance, the D & O policy expressly provides coverage for "all loss ... which the Insured Person has become legally obligated to pay on account of any claim ... for a Wrongful Act committed ... such Insured Person(s) [during the Poli-

cy Period]." Under this provision, the parties would expect that Federal would be responsible for any amount of liability that is attributable in any way to the wrongful acts or omissions of the directors and officers, regardless of whether the corporation could be found concurrently liable on any given claim under an independent theory. *Cf. Okada,* 823 F.2d at 280 (stating that the insurer must pay whenever the directors are "legally obligated to pay") (applying Hawaii law). Only if the corporation were liable for a claim for which the directors and officers lacked any responsibility, or if the corporate liability increased the amount of loss, would the amount of liability exceed that amount for which Federal was "legally obligated" to pay. *See Harbor,* 922 F.2d at 368; *Caterpillar,* 864 F.Supp. at 853; *Raychem Corp. v. Federal Ins. Co.,* 853 F.Supp. 1170, 1182–83 (N.D.Cal. 1994) (under California law, adopting the larger settlement rule for application to case arising under a similar policy). We conclude that under this particular D & O policy, the larger settlement rule best effectuates the reasonable expectations of the parties. Accordingly, we will allocate only if there is some amount of corporate liability that is both independent of and not duplicated by liability against the directors and officers.[2]

### B. Nordstrom's Relative Exposure

In determining whether Nordstrom faced any independent, nonconcurrent liability, we may only consider the claims actually settled, which are defined by the allegations in the complaint. *Caterpillar,* 864 F.Supp. at 854 (citing *Raychem Corp. v. Federal Ins. Co.,* 853 F.Supp. 1170 (N.D.Cal.1994)); *cf. Prudential Property & Casualty Ins. Co. v. Lawrence,* 45 Wash.App. 111, 724 P.2d 418, 420 (1986) (considering the allegations in the complaint to assess whether insurer had a duty to defend). We construe the complaint liberally and are not bound by its formal

language. *See Caterpillar,* 864 F.Supp. at 854; *Prudential,* 724 P.2d at 420.

We conclude that Nordstrom's liability, even where based on an independent theory, was wholly concurrent with D & O liability. We reach this conclusion because we reject both theories by which Federal claims that there was independent and nonconcurrent liability on the part of Nordstrom. Federal first argues that because the complaint alludes to Nordstrom employees' responsibility for allegedly misleading press releases and other public representations, Nordstrom was exposed to *vicarious* liability based on the acts of these uninsured corporate employees, and the directors and officers were not necessarily responsible for those actions as "controlling persons" within the meaning of section 20(a) of the 1934 Act. Second, Federal asserts that the corporation could be solely and directly liable for certain acts and omissions of the directors and officers, because it is possible that only the corporation, under a theory of "collective scienter," would have had the intent required to establish liability.

### 1. Vicarious Corporate Liability

Federal argues that the corporation may have been independently liable because it may have faced vicarious liability under the doctrine of *respondeat superior* for actions by Nordstrom employees such as personnel director Joseph Demarte and public relations director Chris Bridenbaugh. Even if we were to find that persons other than the named directors and officers engaged in activity in furtherance of securities fraud, however, the insured directors and officers would be liable for these same acts because they are "controlling persons" under section 20(a).[3] Although *respondeat superior* liability is independent of section 20(a) liability, *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1578 (9th Cir.1990), *cert. denied,* 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991), in the present case any corporate

---

**2.** We reject Federal's contention that allocation in this case should also depend on an analysis of factors other than liability, such as negative publicity, that might have had a practical effect on the amount of the settlement. Although such factors have been applied by other courts, we decline to require consideration of such factors, which likely would lead to protracted discovery on issues wholly outside the context of liability.

*Cf. Harbor,* 922 F.2d at 367 (indicating that the court should look beyond the specific allegations in the complaint *only* to find evidence that unnamed persons "contributed materially to the fraud") (emphasis added).

**3.** Under section 20(a), "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter ... shall also

*respondeat superior* liability would be concurrent with the directors' and officers' section 20(a) liability. *See Raychem,* 853 F.Supp. at 1183. In *Raychem,* the court rejected the claim that independent corporate liability arose from the dissemination of misleading statements by employees other than the named defendants for two reasons applicable to the present case: (1) the named defendants approved the misleading statements, and (2) there was no evidence that the employees' activities increased the amount of the settlement. *Id.*

Federal theorizes that liability was not necessarily concurrent because the directors and officers may have been able to avoid section 20(a) liability by invoking the "good faith" defense. *See* 15 U.S.C. § 78t(a). Citing an unpublished decision, Federal argues that because corporations cannot employ this statutory defense to avoid *respondeat superior* liability, Nordstrom would then be solely liable for some of the fraudulent activity, thus necessitating allocation.

■ Federal's theory fails in this instance because these directors and officers cannot invoke the good faith defense. According to the statute, the defense is only available when the directors and officers did not "directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t; *see Hollinger,* 914 F.2d at 1575 (holding that a "controlling person" need not be a "culpable participant"). The defense is unavailable even when the defendants who induced the fraud believed in good faith that they were not perpetrating a fraud. *See Myzel v. Fields,* 386 F.2d 718, 738–39 (8th Cir.1967) (stating that a controlling person who approves actions constituting fraud activity cannot invoke the good faith defense, even if he has no knowledge of the deceit), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); *see also Zweig v. Hearst Corp.,* 521 F.2d 1129, 1133 (9th Cir.) (addressing the non-inducement prong of the good faith defense before considering the good faith prong), *cert. denied,* 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975); *First Interstate Bank v. Pring,* 969 F.2d 891 (10th

Cir.1992) (stating that nonparticipation in the fraud and good faith are parts of the good faith defense), *rev'd on other grounds,* —— U.S. ——, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

In this instance, the allegedly misleading public disclosures, press releases, and statements to the press that constituted the fraud were all approved by one or more of the insured directors and officers. The Federal attorney's interviews of Nordstrom directors, officers, and employees, reveal that an Executive Committee consisting of four of the insured directors and officers reviewed and approved the press releases. James Nordstrom specifically stated that the public relations department reported directly to him. Most significantly, public relations director Chris Bridenbaugh stated that she was involved in *all* press disclosures, and that these responses to the media were "cleared through a member of the Nordstrom family." By authorizing the misleading statements, the insured directors and officers induced the fraud. *Cf. Kersh v. General Council of Assemblies of God,* 804 F.2d 546 (9th Cir.1986) (noting that when a broker had knowledge that transactions were occurring, and approved of and accepted the benefits of the transactions, he had participated and induced the unlawful activity, even though he did not know that the transactions were unlawful) (citing *Hecht v. Harris, Upham & Co.,* 283 F.Supp. 417, 439 (N.D.Cal.1968), *modified on other grounds,* 430 F.2d 1202 (9th Cir.1970)). Federal has presented no evidence to indicate that Demarte, Bridenbaugh, or any other Nordstrom employee violated the established policy and issued unauthorized statements that contributed to the fraud. Thus, the fact that the directors and officers induced the fraud by approving the allegedly misleading public statements precludes invocation of the good faith defense. Accordingly, we find no genuine issue of material fact on whether vicarious corporate liability could establish a basis for allocation.

### 2. Direct Corporate Liability

■ Federal also argues that Nordstrom may have had direct corporate liability for

be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith

and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

the securities fraud. For example, a corporation may be liable for actions by senior management personnel that are "intrinsically corporate and bear the imprimatur of the corporation itself." *Caterpillar,* 864 F.Supp. at 856. In the present case, however, such liability also would be concurrent with director and officer liability, because the Nordstrom directors and officers authorized the fraud, including the issuance of the press releases and public statements. Because Federal has not shown how the direct corporate liability would have increased the settlement amount, allocation is not required. *See Caterpillar,* 864 F.Supp. at 857 (citing *Harbor* ) (rejecting allocation based on direct corporate liability).

Federal's reliance on *Olympic Club v. Those Interested Underwriters at Lloyd's London,* 991 F.2d 497 (9th Cir.1993), and *Slottow v. American Casualty Co.,* 10 F.3d 1355 (9th Cir.1993),[4] is misplaced. In *Olympic Club,* the underlying complaint, which alleged racial and gender discrimination by the Club, did not allege liability arising from the acts or omissions of directors or officers. 991 F.2d at 501. Thus, there was no concurrent liability. In *Slottow,* the parties had already agreed to an allocation; the court held that under California law, the settlement arrangement was not made in good faith because it did not reasonably reflect the relative liabilities of the parties. 10 F.3d at 1359. The case did not address an insurer's right to allocation on the basis of direct corporate liability. *See Raychem,* 853 F.Supp. at 1183 (rejecting reliance on *Slottow* in the context of allocation between corporate and D & O liability).

Federal also claims that Nordstrom's direct corporate liability would not be concurrent with D & O liability because the directors and officers may have defenses unavailable to the corporation. Noting that one element of a Rule 10b–5 action is scienter, *see Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1380–81, 47 L.Ed.2d 668 (1976), Federal argues that it is conceivable that a jury would find that none of the named directors and officers had the requisite intent, but that the corporate entity had such intent under a theory of "collective scienter." Theoretically, collective scienter could be a basis for liability. "In litigation

involving Section 10(b) of the Securities Exchange Act and SEC Rule 10b–5, even though a corporation is incapable of acting except through individual directors and officers, the cumulative knowledge of its directors and officers is imputed to it.... [A] corporation's knowledge need not be possessed by a single officer or agent; the cumulative knowledge of all its agents will be imputed to the corporation." Knepper & Bailey, *supra* § 1.02, Supp. at 4; *see also* William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 790, at 16 (perm. ed.) ("The knowledge necessary to adversely affect the corporation does not have to be possessed by a single corporate agent; the cumulative knowledge of several agents can be imputed to the corporation.").

However, there is no case law supporting an independent "collective scienter" theory. Although the court in *In re Warner Communications Securities Litigation,* 618 F.Supp. 735 (S.D.N.Y.1985), *aff'd,* 798 F.2d 35 (2d Cir.1986), noted that a corporation's scienter could be different from that of an individual director or officer, it expressly stated that such scienter would require a showing that "one or more members of top management knew of material information ... but failed to stop the issuance of misleading statements ... or that Warner management had recklessly failed to set up a procedure that insured the dissemination of correct information." *Id.* at 752.

Moreover, there is no evidence in this case to support "collective scienter" without a concurrent finding that a defendant director or officer also had the requisite intent. A finding of liability under section 10(b) requires recklessness, which is defined as "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the ordinary standards of care, ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Hollinger,* 914 F.2d at 1568–70 (adopting definition articulated in *Sundstrand Corp. v. Sun Chem. Corp.,* 553 F.2d 1033, 1044–45 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 224, 225, 54 L.Ed.2d 155

4. We note that the version of the *Slottow* opinion addressed by the parties, reported at 1 F.3d 912 (9th Cir.1993), was superseded by the amended opinion reported at 10 F.3d 1355.

(1977)). Thus, corporate scienter relies heavily on the awareness of the directors and officers, who—unlike the public relations or personnel departments—are necessarily aware of the requirements of SEC regulations and state law and of the "danger of misleading buyers and sellers." *See In re Warner*, 618 F.Supp. at 752. On this record, we see no way that Federal could show that the corporation, but not any individual defendants, had the requisite intent to defraud. Thus, any direct corporate liability would be derivative of, or concurrent with, D & O liability.

■ Our preceding analysis reveals that Nordstrom has satisfied its burden of showing that the D & O policy covered the entire settlement amount. Federal has not demonstrated any genuine issue of material fact as to whether the corporation may have incurred liability that was not concurrent with that of the insured directors and officers so as to preclude summary judgment. *See Raychem*, 853 F.Supp. at 1176. If Federal maintains that it has paid more than its fair share of the settlement agreement, it may exercise its right to bring an action for contribution or indemnification. *See Employers Ins. of Wausau v. Musick, Peeler & Garrett*, 954 F.2d 575, 578 (9th Cir.1992), *aff'd* — U.S. ——, 113 S.Ct. 2085, 124 L.Ed.2d 194 (1993); *see also Grange Ins. Ass'n v. Great American Ins. Co.*, 89 Wash.2d 710, 575 P.2d 235, 240 (1978) (holding that an insurer who has settled a claim without admitting liability may seek indemnification from a liable insurer). However, where the settlement agreement provides for joint and several liability and the directors' and officers' liability was coterminous with that of the corporation, we reject Federal's claims for allocation.[5]

### III. Discovery

■ Federal claims that the district court abused its discretion in denying its requests for further discovery to uncover information that uninsured Nordstrom employees were actually responsible for the fraudulent activity attributed to the insured directors and officers. We review the district court's decision not to permit additional discovery pursuant to Federal Rule of Civil Procedure 56(f) for an abuse of discretion. *Qualls v. Blue Cross of California, Inc.*, 22 F.3d 839, 844 (9th Cir.1994). Although allocation does not require the court to resolve all factual and legal questions posed by the underlying action, we agree with the district court that post-settlement discovery is appropriate in the summary judgment context to the extent required for the opposing party to present facts necessary to its opposition. *See Nordstrom*, 820 F.Supp. at 535.

■ We affirm the district court's denial of discovery, largely for the reasons stated in the district court opinion. *Id.* at 535–36. First, Federal has already had ample opportunity for discovery, including over 100,000 pages of documents, and has not established facts to show that additional discovery would lead to new information. *See id.; Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1416 (9th Cir.1987). Second, as noted earlier, evidence that uninsured employees were responsible for some of the fraudulent activity would be largely irrelevant to the allocation issue because the insured directors and officers who oversaw such activity would remain responsible under the controlling person doctrine of section 20(a), such that Federal would be "legally obligated to pay." *See Raychem*, 853 F.Supp. at 1186. Although additional evidence that uninsured Nordstrom employees issued misleading press releases *without* the approval of one of the insured directors or officers would be relevant, the claim that additional discovery would reveal such information lacks any foundation in the present record, particularly when Chris Bridenbaugh, who participated in all releases, has stated that they were cleared through a member of the Nordstrom

---

5. Although Federal does not directly raise the issue of defense costs, it also implicitly challenges the district court's decision that Federal must indemnify Nordstrom for the full cost of the defense. Under Washington law, the insurer is liable for all defense costs if "there is no reasonable means of prorating the costs" between covered and noncovered claims. *Prudential*, 724 P.2d at 424. Because we find that the corporate liability was concurrent with the directors' and officers' liability, and the attorneys' billing statements provide no basis for allocation, *Nordstrom*, 820 F.Supp. at 536, we find that the defense costs cannot reasonably be allocated and affirm the district court's ruling.

family. Accordingly, we find no abuse of discretion in the district court's denial of additional discovery.

### IV. Attorney Fees

█ Although Washington generally follows the American rule in awarding attorney fees, which denies attorney fees in the absence of a contract, statute, or recognized ground of equity providing for such fees, *see State ex rel. Macri v. Bremerton,* 8 Wash.2d 93, 111 P.2d 612 (1941), Nordstrom requests attorney fees for this appeal pursuant to *Olympic Steamship Co. v. Centennial Ins. Co.,* 117 Wash.2d 37, 811 P.2d 673 (1991), which held that an insured party is entitled to attorney fees "in any legal action where the insurer compels the insured to assume the burden of legal action, to obtain the full benefit of his insurance contract." *Id.* 811 P.2d at 681. This rule has been read broadly by Washington courts, even to include cases in which there is no contractual basis for the awarding of fees. *See Estate of Jordan v. Hartford Accident & Indem. Co.,* 120 Wash.2d 490, 844 P.2d 403, 414 (1993). The only articulated limitation to this rule is that no fees are awarded when the insurer does not dispute coverage, but merely disputes the value of the claim. *See Dayton v. Farmers Ins. Group,* 124 Wash.2d 277, 876 P.2d 896, 898 (1994) (declining to award fees in a case involving a disagreement over damages arising from a car accident).

In the present case, the dispute concerns coverage of actions by Nordstrom employees under the D & O policy. Because *Dayton* does not apply to this case, and because this case required Nordstrom to take legal action to gain the "full benefit of [its] insurance contract," *Olympic Steamship,* 811 P.2d at 681, we grant Nordstrom's request for reasonable attorney fees for this appeal.

### CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.